**In the Matter of the WELFARE OF L.K.W., a minor.**

**No. C2–85–732.**

Court of Appeals of Minnesota.

Aug. 6, 1985.

Gary L. Huusko, Mark Arth, Hubert H. Humphrey, III, Atty. Gen., St. Paul, Michael Q. Lynch, Kandiyohi County Atty., Willmar, William Dolan, Meeker County Atty., W. Edward Myers, Asst. Meeker County Atty., Litchfield, for L.K.W.

Considered and decided by WOZNIAK, P.J., and PARKER, and CRIPPEN, JJ., with oral argument waived.

## OPINION

CRIPPEN, Judge.

In May 1984, the child, then age 16, admitted an act of delinquency, that she had violated the misdemeanor shoplifting statute four months earlier. *See* Minn. Stat. § 609.52, subd. 2(1), 3(5) (1984). She appeals the fourth in a series of trial court disposition orders in the case, a decision on April 19, 1985, to remove her from her home for a placement at St. Croix Camp, a private residential facility located 150 miles distant from the family home near Litchfield. The placement was for a stay of 90 to 100 days at a cost of $6,500. The disposition was enforced for 66 days, until June 24, when this court stayed the order and returned the custody of the child to her parents. We reverse the disposition order and dismiss the proceedings.

## FACTS

### 1. June 1984.

When a disposition in the case was first considered in June 1984, the child's parents were separated. She and her brother were staying at her father's farm home, and two younger siblings lived with her mother.

A probation officer reported that the child managed her father's household and was very happy to be with him. The child had an average academic record in her sophomore year at high school, and she had a job as a waitress. She had no record of other law violations, and had no behavioral problems at school. She had already made restitution for the January shoplifting.

The initial probation officer's report also showed that the child had a "chaotic" relationship with her mother. The report said the mother indicated that she had "limit

setting" problems with the child, that she had suspicions about the child's personal conduct, and that the child had been "getting away with murder" since staying with her father; the report added that the mother was confronted about the general accusations but couldn't give any specific information. The officer noted that the mother seemed to her to be "somewhat" of a "perfectionist," and that there was no trust in the relationship of the mother and daughter.

The probation officer attached to her report a summary of psychological facts, based on interviews of three therapists who had dealt with the family. The report indicated serious discord of the parents, a history of family violence, some unspecified battering by the father, and active involvement of both parents and the child in counseling programs. All three therapists believed there was no reason why the child and her brother could not safely live with their father. The child's therapist observed that the child had "genuine distress" when away from her father, and that the mother showed little sensitivity to the child's needs.

The probation officer concluded that family problems were creating stress for everyone involved, and that the child was "somewhat difficult" to deal with, "whether it be because she's hurting or being rebellious at this time." The officer reported that the parents had been attending counseling sessions, and she recommended continued counseling services for the parents and the child. The officer recommended continuing the case for one or two 90 day periods, with temporary probationary supervision.[1]

In July 1984, the trial court entered an order with a finding of delinquency, transferred custody of the child to the Minnesota Commissioner of Corrections for placement at a state correctional facility

---

1. Minn.Stat. § 260.185, subd. 3, permits one or two 90 day continuations in a delinquency case, with temporary counseling or supervision. The statute provides that the remedy is available without entry of an order showing that a delin-

quent act has occurred, but only where the child admits the allegations in the petition. Here the child made that admission at the hearing on May 30, 1984.

for delinquent juveniles, but stayed the transfer and ordered instead: First, that the child stay with her mother for seven days every two weeks; second, that she be under probationary supervision, following rules on curfew, counseling, and obeying both parents; and third, if this arrangement "fails," that she be placed in a foster home. The July order included no findings of fact on the subject of disposition.

### 2. August 1984.

In August, forty days later, again without findings of fact, the court issued an ex parte disposition order, placing the child in foster care and providing for continued probationary supervision.[2] A probation officer reported at a later hearing that his colleague, who was no longer involved in the case, had put the child in foster care on the day preceding the court's second order; the colleague had said there was a "total breakdown" in the relationship of the mother and child, and some unspecified "prob-

lems with" rules on visitation and curfew hours. A July "probation agreement," drawn by the initial officer and signed by the parents and child, stated 22 child behavior conditions. The second condition provided: "Either spend 50% of time living with each parent at rate of 3 days one week & four days the next *or* foster home."

### 3. October 1984.

On September 12, 1984, two weeks after the child was ordered removed from her home, her attorney requested a formal hearing to review the ex parte disposition under Minn.R.Juv.Ct.P. 30.07, subd. 2.[3]

A review hearing was conducted late in October 1984.[4] The child testified that her mother asked the probation officer to put her in a foster home, and that she didn't think her mother wanted her to come back. She said she had a positive relationship with her father. This testimony was uncontradicted.

---

**2.** Disposition reviews are ex parte, according to a juvenile court rule promulgated in December 1982. A party may request a formal review hearing after a modification is ordered. The rule provides:

Subd. 1. Timing. The court shall review all disposition orders except disposition to the Commissioner of Corrections at least every six (6) months.

Subd. 2. Modification of Disposition. Upon review the court may modify the disposition when:

(a) there appears to be a change of circumstances sufficient to indicate that a change of disposition is necessary, or

(b) it appears that a disposition is inappropriate.

The court shall inform the child, the child's counsel, the county attorney and the child's parent(s) and guardian and their counsel in writing of the modification of disposition within ten (10) days of the modification and of the right to a formal review hearing pursuant to Rule 30.07.

Minn.R.Juv.Ct.P. 30.06.

**3.** The rule provides:

The child's counsel, the county attorney or the counsel for the parent(s) and guardian of the child may request a formal review hearing or the court may hold a formal review hearing on its own motion when:

(a) there appears to be a change of circumstances sufficient to indicate that a change of disposition is necessary, or

(b) it appears that the disposition is inappropriate.

A request for a formal review hearing shall be in writing and shall list the reasons supporting the request. Upon a request for a formal review hearing being filed with the court, the court shall within ten (10) days determine if there is good cause to believe that (a) or (b) above exists. If the court finds from the request for a formal review that there is good cause to believe that (a) or (b) above exists, the court shall hold a formal review hearing within ten (10) days of the finding.

If the court finds from the request for a formal review that there is not good cause to believe that (a) or (b) above exists, the court shall inform the person making the request that the request has been denied.

Minn.R.Juv.Ct.P. 30.07, subd. 2.

**4.** It is unclear whether the review was conducted on the child's request or on the motion of the court. The hearing was convened 34 days after the request was filed, two weeks beyond the maximum time for a requested hearing. *See* footnote 3. Under the rule, however, the trial court may refuse to conduct a formal hearing, if it finds no showing of good cause to believe the modification was inappropriate, and no showing of later events requiring a further change. Comments at the hearing suggest a refusal had occurred. The file includes no refusal order, but none is expressly required by the rule.

A psychologist's current report, authored by the therapist who had also examined the child in June, said the child was harmed by foster care and by being ordered to stay part-time with her mother; the psychologist saw the child's adjustment deteriorating with either arrangement. This report was also uncontradicted. The child said she wanted to stay at home with her father: "I just can't understand * * * I have lived there all my life, it's my home and they won't let me live there."

The child testified that her father had beaten her, but that this had occurred two and a half years earlier. She said she had no fear he would hurt her. There was no testimony at the hearing about disadvantages in care of the child by her father.[5]

The foster mother testified that she found the child's behavior was very good. The probation officer's written report concluded that undue stress "often" leads to negative, delinquent behavior, and that the child should be kept in foster care. The officer testified that he knew of no violations by the child of conditions of probationary supervision.

On October 26, the trial court amended its disposition order to end the foster care placement, but with continued probationary supervision. Again, the court ordered that the child spend seven of every 14 days with her mother; and again, the disposition order included no findings of fact.

#### 4. April 1985.

After six months, on April 19, 1985, the trial court conducted an additional review hearing. Testimony indicated that the child's seven day stays with her mother ended in mid-February. The probation officer first learned about this from the moth-er on about April 4. The officer said that he then left messages with the mother and father to have the child contact him but that she didn't get in touch with him until the day of the hearing.

The officer reported to the court that the child had committed no offenses and had no school problems.[6] Her father reported that she had followed the probation rules.

The probation officer recommended placing the child at St. Croix Camp. A trial court order dated April 16 [sic], 1985, provides for the placement. The order includes a finding that the child had disobeyed a court order and violated her probation, and that she had been placed before, in August 1984, "due to disruptive behavior."

The April review hearing was short, apparently completed in about ten minutes. The child and her parents commented briefly, and the probation officer and the trial court then stated their views.

The child reported that things were going well. She testified: "I guess it just works out better if I don't see much of mom, because then we can get along better, and we don't fight." Asked about a placement, she said she didn't want to go.

The child's father confirmed her behavior was good. The mother reported that she and her daughter were talking and getting along better. She added that she wanted to see more of the child, but she said nothing to show that she was unhappy about what had happened, or that she wanted something done about it.

The child's probation officer faulted the child and her parents for involvement in a problem he wanted "to come to an end." As to the child, he concluded:

> The officer's report also noted that a relationship of the child and her mother was "non-existent," and that this would not change until the entire situation was "recultured," which would not take place for many months, "if not years."

5. In a written report, the child's new probation officer noted that he thought it would not be "healthy" for the child to live with her father, because of "the pressures at hand," a reference that apparently relates to the conclusion, not further detailed, that the father was "upset with his situation and with his wife." The report added, also without explanation, that "probably many of [the father's] actions and favors relayed towards [the child] are nothing more than attempts to lash out against his spouse."

6. The officer's report noted that the child "continues a rather cavalier attitude." The point is neither explained nor demonstrated, and it is apparently the officer's interpretation of the absence of immediate response from the child to a message left with each parent.

I guess I don't see [the child] as being the type of probation case that one could effectively work with. It isn't the fact that she's, uh, out violating the law, it's the fact that, as I see it, [the child] doesn't have an understanding of the fact that there are rules, things that have to go on in her life that she has to follow. As I see the situation, she believes that she can do as she sees fit, how she sees fit, and everything is fine.

The officer criticized the parents because they hadn't told him the child's living arrangements had changed. He stated his personal regrets that there could not be a placement of both the child and the parents.

The trial court announced that its decision was made because its prior disposition "is not working," and most likely wouldn't in the future. The court directed the remainder of its explanation to the child:

> You had your choice before. Now you don't have a choice any more. Everybody's been giving you a chance all the way along, and you don't seem to want to follow the rules. The rules are set down for reasons, and discipline is one of the big reasons here.

> \* \* \* \* \* \*

> Now you seem to think that you dictate the discipline, and that isn't true. Uh, in this particular case, the discipline is set down by the Court and your parents, and you have to abide by it. And you haven't done it. And that's the reason Mr. Johnson says that he can no longer be of any help to you. You're not gonna follow, you won't follow his rules, the rules set down. Up there they'll teach you discipline.

The record does not show program characteristics of St. Croix Camp, or the kinds of adolescent problems commonly referred to the camp. The probation officer told the court the program was "excellent" and would be "meaningful" for the child. He said the program was "successful" in one or two other cases referred by his fellow officer.

## ISSUES

1. Does evidence show that institutional placement of the child was necessary for her rehabilitation?

2. Does evidence show that removal and placement of the child served her best interests?

3. Are the trial court's findings of fact sufficient to support its dispositional order?

## ANALYSIS

Innumerable delinquency dispositions have been determined since the legislature first established juvenile courts eighty years ago. *See* 1905 Minn. Laws ch. 285; 1909 Minn. Laws ch. 232. Remarkably, however, the topic has not been previously addressed in a published Minnesota appellate decision.

We approach the subject with recognition of the broad discretion of the trial court. As in the case of a custody decision in a dissolution case, we will affirm so long as the trial court determination is not arbitrary. *See Hansen v. Hansen*, 284 Minn. 1, 5, 169 N.W.2d 12, 14 (1969). Trial court dispositional findings of fact will be accepted unless clearly erroneous. Minn.R.Civ.P. 52.01.

Dispositional choices are enumerated in Minn.Stat. § 260.185, subd. 1 (1984). The juvenile court is directed to use the choice of disposition judged "necessary to the rehabilitation of the child." *Id.*

In 1976, the Minnesota Legislature added a standard, a demand that the order for a disposition state "why the best interests of the child are served by the disposition ordered." *Id. See* 1976 Minn. Laws ch. 150, § 1. Findings must also note alternative dispositions considered by the court and reasons "why such dispositions were not appropriate in the instant case." Section 260.185, subd. 1. The 1976 additions to section 260.185 were restated by the Minnesota Supreme Court in Minn.R.Juv.Ct.P. 30.05.

1. The least drastic step necessary to restore law-abiding conduct.

■ The aim in delinquency dispositions is "rehabilitation," restoration of lawful conduct. Section 260.185, subd. 1 (1984). The juvenile court act is aimed at instilling a capacity for lawfulness, "developing individual responsibility for lawful behavior." Minn.Stat. § 260.011, subd. 2 (1984).

■ It is reversible error, both arbitrary and unjust, to impose a disposition without evidence that it is "necessary" for the declared statutory purpose of restoring law-abiding conduct. Section 260.185, subd. 1. The restraint compelled by a standard of necessity coincides with the legislative aim to confine the means employed by the juvenile court to those which are "fair and just." Section 260.011, subd. 2.

■ To measure what is necessary, a trial court must assess two factors, the severity of the child's delinquency, and the severity of the proposed remedy. When the severity of intervention is disproportionate to the severity of the problem, the intervention is not necessary and cannot lawfully occur. The court must take the least drastic necessary step.

The Minnesota "necessary" standard coincides with principles stated by other authorities. The supreme court of a neighbor state calls for approaching the determination of a delinquency disposition "in a spirit of optimism," with recognition and favor for less "drastic" steps that still permit a "reasonable hope" for equal success. *State v. Myers*, 74 N.D. 297, 302, 22 N.W.2d 199, 201 (1946). Recently promulgated standards state this spirit in the form of a preference for the least restrictive action consistent with the child's problem.[7]

We find no evidence at all showing rehabilitation needs of L.K.W. in April 1985 such as to call for a severe corrections disposition, confinement to a residential facility to instill obedience.

Prior violations of law enlarge the need for rehabilitation. The child here had none.

■ Need is measured in part by the seriousness of the offense. The child admitted a misdemeanor theft.

Rehabilitation may require restitution. The child completed restitution before the first disposition was determined in July 1984.

The need for rehabilitation is enlarged by repetition of unlawful conduct. There is no evidence of any public offense by the child since her only delinquent act.

■ Rehabilitation needs may be indicated by violations of conditions of probationary supervision. During ten months of supervision beginning July 1984, the juvenile followed 21 child behavior conditions. In its 1985 order, the trial court found that the child's "disruptive behavior" led to a placement in August 1984; the evidence shows a demand for removal by the child's mother and does not depict misconduct of the child; the finding is clearly erroneous.

■ The trial court cited one violation of rules of probation. The child did not stay with her mother on alternating weeks after February 14, 1985. The child was not accused of a contemptuous act; there was no proceeding aimed at a sanction for unlawful contempt, and there was no suggestion of an effort to gain future compliance with an order on the child's place of residence; in fact, it would be an egregious injustice to impose sanctions on a child due to her custody preference upon separation of her parents, or to use those sanctions as

---

7. National standards provide:

In determining the type of sanction to be imposed following adjudication of a delinquency petition and the duration of that sanction within the statutorily prescribed maximum, the family court should select the least restrictive category and time period consistent with the seriousness of the offense, the juvenile's role in that offense, and the juvenile's age and prior record.

Standards for the Administration of Juvenile Justice § 3.182, National Advisory Committee for Juvenile Justice and Delinquency Prevention (1980). *See also* Juvenile Justice Standards: Standards Relating to Dispositions § 2.1, A.B.A., Inst. of Judicial Administration (1979).

a means to resolve the parents' custody dispute; furthermore, the evidence is insufficient to show a contemptuous act independent of the conduct of the child's parents.

■■■ Instead, we should assume that the court cited the child's place of residence as proof of need to act further and more severely on a 15 month old misdemeanor. This finding of the trial court was clearly erroneous. In determining a disposition, the court must look at rehabilitative needs which are germane to the child's violation, or germane at least to prospective unlawful behavior. There is no credible evidence in this record to indicate the child's residence with her mother contributed to her good conduct; to the contrary, the evidence showed that the placement endangered the child's personal adjustment.

Finally, the showing of need must be considered alongside the facts on the severity of the disposition. Here the child was confined to a residential facility. Reason does not permit a distinction between punitive incarceration and a so-called "placement" to "teach you discipline," a disposition explained as the end of personal choice and as a consequence of breaking rules. The placement took the child from her home, her school, and her job, and 150 miles from her family and friends. It extended the trial court's use of authority to at least the 18th month after a misdemeanor violation. The severity of the disposition was compounded by the fact that the child had previously been removed from her home for similar reasons.

The evidence is insufficient to show a need for any disposition in April 1985. In fact, it is difficult to find support from the evidence for any disposition in this case other than the continuation and supervision proposed initially in a complete and soundly-reasoned report of the child's first probation officer; the integrity of that report is enhanced by the entire subsequent history

of the case. The choice of a correctional placement in April 1985 was arbitrary, neither necessary, fair, nor just.

2. Special regard for valuable family relationships. Suitable for the child's needs.

■■■ A delinquency disposition must also serve the child's best interests. Section 260.185, subd. 1. Initially, we note that this standard does not supersede the statutory language on a disposition which is "necessary." The 1976 amendment of section 260.185, subd. 1, calls for findings both about dispositional choices and about the child's best interests. The promise of benefits in a disposition, that the choice would be good or even best, does not permit an action which is not necessary. *See State ex rel. Renning v. Armstrong*, 141 Minn. 47, 48, 169 N.W. 249, 249 (1918). The disposition here, which was not necessary, is not made legitimate by claims in the record that the placement would make the child a better student or train her about discipline.

■■■ The best interests standard adds at least two requirements in any case where a residential placement is considered.[8] First, there must be evidence that aims of the law cannot be realized without removal of the child from her home.

■■■ The preference against removal has been legislated in Minnesota and independently recognized by the supreme court. Juvenile care and guidance that serves the interests of the child and the state will "preferably" be in the child's own home. Section 260.011, subd. 2. It is presumed that the child's parents are fit, partly because of "the public policy determination that the best interests of the child are normally served by parental custody." *In re Welfare of A.R.W. and Y.W.C.*, 268 N.W.2d 414, 417 (Minn.), *cert. denied*, 439

---

**8.** Additionally, among placement choices, the juvenile court act states a preference that may restrain use of some institutional programs: It is the purpose of the law,

when the child is removed from his own family, to secure for him custody, care and discipline as nearly as possible equivalent to that which should have been given by his parents. Minn.Stat. § 260.011, subd. 2 (1984).

U.S. 989, 99 S.Ct. 588, 58 L.Ed.2d 663 (1978).

■■■ What is the significance of the preference against removal in a delinquency case? If a child has valuable home relationships, they cannot be taken away without evidence of unusually severe needs of the child for rehabilitation. *See Myers,* 74 N.D. at 302–03, 22 N.W.2d at 201. (The court used a standard of "danger to society" where an institutional placement was reversed.)

Second, there must be evidence that the placement being considered is suitable for the needs of the child.

If a placement is not suited to actual needs of the child, it cannot serve the child's best interests.[9] The legislature has a purpose to see that care and guidance are secured for children "as will serve the spiritual, emotional, mental, and physical welfare of the child and the best interests of the state." Section 260.011, subd. 2. To serve the child's best interests where a placement is considered, the evidence should reveal the program of a facility and a competent assessment of the child's needs.

Uncontradicted evidence here shows that the child had meaningful ties in a family home. Throughout the pendency of the case, the father has been available to care for the child, and there is no credible evidence to show that he cannot carry out that responsibility. He has a good, positive relationship with the child, and he has maintained efforts to deal with his own mistakes; the child and three therapists are confident he will control his behavior.

There is no evidence to describe the staff or program at St. Croix Camp. The probation officer testified that the program was "excellent" and "meaningful;" he ex-

plained that he was well-acquainted with "the people that run the program," and that the facility had been "successful" in one or two cases handled by another officer. These observations fail to show the nature of the program or a reliable basis for evaluating its services.

■■■ The probation officer reported to the court that the St. Croix Camp program would be an "excellent mechanism" to teach the child "limits" and elevate her "self-esteem."[10] The record does not indicate the child has self-esteem problems. Her acceptance of limits was not currently discussed and had never been even partly detailed. This is inadequate evidence for diagnosis of needs which might be addressed in a residential program.

Just as there was error here in the imposition of an unnecessary disposition, there was error in taking action which did not serve the best interests of the child.

3. Findings on rehabilitation needs and family relationships. Findings on suitability of a residential program.

■■■ Dispositional findings are mandated by the legislature and the supreme court. Minn.Stat. § 260.185, subd. 1; Minn.R.Juv.Ct.P. 30.05. These must address the dispositional choices "considered by the court" and reasons "why" one is preferred. Section 260.185, subd. 1. They must address the interests and the needs of the child.

These requirements for findings are among others in family law cases which are designed to guarantee that the trial courts consider vital standards. *See* Minn.Stat. §§ 518.17, subd. 3 (custody determinations), 518.18 (custody modifications), 253B.09, subd. 2 (involuntary hospitalization), and

---

**9.** National Advisory Committee standards provide:

> After determining the degree of restraint and the duration of the disposition to be imposed, the court should select the type of program or services to be offered on the basis of the juvenile's needs and interests.

Standards for the Administration of Juvenile Justice, *supra* note 7, at § 3.182.

**10.** The officer also told the judge that the placement would be a "costly adventure." In his written report he added: "I believe dad is the main motivator in this situation and he could pay a portion of the costs of the stay." The record is void of evidence that the child's father prompted any conduct of his daughter.

260.125, subd. 5 (reference from juvenile court to adult court) (1984); *see also Kent v. United States,* 383 U.S. 541, 561, 86 S.Ct. 1045, 1057, 16 L.Ed.2d 84 (1966). The findings also enable the parties to understand the decisions of the court. Finally, they are necessary for meaningful review. *Id.; Wallin v. Wallin,* 290 Minn. 261, 267, 187 N.W.2d 627, 631 (1971). Because the findings serve these important purposes, it is reversible error to omit them. *Peterson v. Peterson,* 308 Minn. 297, 307, 242 N.W.2d 88, 94 (1976); *see Rosenfeld v. Rosenfeld,* 311 Minn. 76, 82, 249 N.W.2d 168, 171 (1976).

■■■ The final disposition order here contains one finding commenting on an earlier placement and one on a course of disobedience. Alternatives are not addressed. The findings deal neither with the interest of the child for placement in her own home, nor with the needs of the child that are expected to be met in a placement. The findings do not comply with the letter or the spirit of the controlling statute and rule. This error is an independent basis for reversal.

4. Control over the choice to remove children.

In one sense, the law of the case is uncomplicated. The juvenile court act demands restraint of juvenile justice personnel. More particularly, the statutes compel control over the choice to remove children from their own home, a determination to avoid unnecessary or harmful placements. Minn.Stat. §§ 260.011, subd. 2, 260.185, subd. 1.

On the other hand, the language employed in this field of law can easily obfuscate the issue. Several observations must be made to avoid this hazard.

a. The issue is not a creature of modern due process law. Instead, the issue is one of legal standards, and the issue has been recognized for at least a half century. Dean Roscoe Pound addressed the precise point 50 years ago:

Child placement involves administrative authority over one of the most intimate and cherished of human relations. The powers of the Star Chamber were a trifle in comparison with those of our juvenile courts and courts of domestic relations. The latter may bring about a revolution as easily as did the former. It is well known that too often the placing of a child in a home or even in an institution is done casually or perfunctorily or even arbitrarily.... Even with the most superior personnel, these tribunals call for legal checks.

Pound, *Foreword* to P. Young, Social Treatment in Probation and Delinquency at xxvii (1937).

Swiss psychiatrist Lucien Bovet, 14 years later, wrote:

One of the most definite conclusions of this investigation is that few fields exist in which more serious coercive measures are applied, on such flimsy objective evidence, than in that of juvenile delinquency.

Bovet, Psychiatric Aspects of Juvenile Delinquency 79 (1951), *quoted in In re Gault,* 387 U.S. 1, 19 n. 25, 87 S.Ct. 1428, 1439 n. 25, 18 L.Ed.2d 527 (1967).

Finally, 18 years ago the United States Supreme Court described the plight of Gerald Gault:

Under traditional notions, one would assume that in a case like that of Gerald Gault, where the juvenile appears to have a home, a working mother and father, and an older brother, the Juvenile Judge would have made a careful inquiry and judgment as to the possibility that the boy could be disciplined and dealt with at home, despite his previous transgressions. Indeed, so far as appears in the record before us, except for some conversation with Gerald about his school work and his "wanting to go to * * * Grand Canyon with his father," the points to which the judge directed his attention were little different from those that would be involved in determining any charge of violation of a penal statute.

*Id.* at 28–29, 87 S.Ct. at 1444 (deletion in original; footnotes omitted). This narration was part of the court's well-known observation that "the condition of being a [child] does not justify a kangaroo court." *Id.* at 28, 87 S.Ct. at 1444.

b. The rule of law on restraint toward placements does not erode the *parens patriae* role of the juvenile court. To the contrary, it gives integrity to the guardianship of the court for the welfare of the child.

c. Similarly, the discipline of restraint does not conflict with notions of individualized justice. That concept does not license public authorities to do whatever they wish, to act on their individualized views. Rather, it involves a primary demand that nothing be done which is not necessary and suitable for the individual.

 d. The standard of restraint toward placements cannot be compromised due to policy concerns for public safety, for the protection of children from abuse, or for residential programs designed to treat children or to positively modify their behavior. The problems of shoplifting, of vandalism, or of robbery are not solved by putting L.K.W. in a residential unit without evidence of need or value. Nor does the placement remedy the abuse suffered by L.K.W. or other children. Nor does the placement enhance the delivery of treatment services to those who need them.

e. Finally, the issue here is not the topic of modern juvenile justice debates. *See, e.g.,* Feld, *Criminalizing Juvenile Justice: Rules of Procedure for the Juvenile Court,* 69 Minn.L.Rev. 141 (1984). The standards for restraint toward placements have never been seriously questioned. Instead, current discussion focuses on the decision-making processes, including the administration of the courts, that better guarantee proper respect for standards.

5. Review of disposition.

This appeal is from an order in proceedings to review an earlier disposition. *See* Minn.Stat. § 260.185, subd. 4; Minn.R.Juv. Ct.P. 30.06, 30.07. The opinion has dealt generally with juvenile law standards on dispositions, but those standards also govern review decisions. The review is to determine whether a prior disposition is "inappropriate," whether changed circumstances show that a different disposition is "necessary." Minn.R.Juv.Ct.P. 30.06, subd. 2.

Where a review deals with the child's response to prior demands, an unusually strict respect for disposition standards is normally in order.

The United States Supreme Court has "long recognized the potential for abuse" when one may be punished for acting with contempt toward a court order. *Bloom v. Illinois,* 391 U.S. 194, 202, 88 S.Ct. 1477, 1482, 20 L.Ed.2d 522 (1968). Care is required to avoid arbitrary conclusions in contempt cases. *Id.* The situation here was no different than a contempt case; the court dealt with the case with almost singular focus on the integrity of its prior demand for time the child was to spend with her mother.

Any new extension of judicial action is apt to enlarge the severity of the original disposition. This is additional cause for careful use of standards when reviewing a delinquency disposition.

6. Closing.

The three month confinement of L.K.W. 150 miles from her home, summarily ordered, for no lawful cause, was singularly harsh and unjust. The wrong was enlarged by the case history of another 60 day removal, determined ex parte, and the unexplained rejection of the single evenhanded public action that appears in the record, the recommendation by the child's first probation officer.

The events here sharply contrast with practice and procedure L.K.W. would have encountered in adult court. With restitution already completed, an adult in a comparable case could anticipate a moderate fine. If other penalties were imposed, they would likely be suspended on the sole condition that no other offenses occur. Some

403

courts would suspend all or part of the fine. Some courts or prosecutors would withhold the record of conviction for a first offense of the kind. Ironically, adult process includes a right to trial by jury that is extended to the case because of the possibility of incarceration. Minn.R.Crim.P. 26.-01, subd. 1(1)(a).

In sum, the record here demonstrates public action which is alarmingly arbitrary. It arouses the same concerns announced two decades ago by the United States Supreme Court:

> [T]he highest motives and most enlightened impulses led to a peculiar system for juveniles, unknown to our law in any comparable context. The constitutional and theoretical basis for this peculiar system is—to say the least—debatable. And in practice * * * the results have not been entirely satisfactory. Juvenile Court history has again demonstrated that unbridled discretion, however benevolently motivated, is frequently a poor substitute for principle and procedure.

*Gault,* 387 U.S. at 17–18, 87 S.Ct. at 1438–39 (citation and footnote omitted).

We have searched the record to find cause for the trial court's decision, but none has been found. We are bound by the record, as is the trial court, and we are not permitted to speculate about the knowledge or motives of officials that might further explain what happened here.

## DECISION

The evidence is insufficient to support the institutional placement of the child, or any future disposition in this case. The dispositional order of the trial court contains inadequate supporting findings. The order is reversed and the case dismissed.

**Reversed.**