**In the Matter of the
WELFARE OF D.S.F.**

No. C4–87–820.

Court of Appeals of Minnesota.

Dec. 15, 1987.
Review Denied Feb. 17, 1988.

Paul Engh, Minneapolis, for D.S.F.

Hubert H. Humphrey, III, Atty. Gen., Thomas L. Johnson, Hennepin Co. Atty., Patricia Kerr, Asst. Co. Atty., Minneapolis, for respondent State of Minn.

Heard, considered and decided by CRIPPEN, P.J., and FOLEY and LANSING, JJ.

## OPINION

LANSING, Judge.

The trial court adjudicated D.S.F. delinquent for an act of third-degree assault and ordered restitution and a 90–day placement in the Hennepin County Home School Alpha Program. D.S.F. appeals, contending that the evidence of intent to commit the assault was insufficient to support the adjudication and the trial court should have imposed a less restrictive disposition. We affirm.

## FACTS

On a school day in November 1986, 17–year-old D.S.F. went to Minnetonka High School to pick up his girlfriend. D.S.F. had earlier withdrawn as a student because of problems with the school, and a hall monitor asked him to leave. Upset at this direction, D.S.F. struck a locker with his fist as he began walking down the hallway. When he met three students walking in the opposite direction, he grabbed one by the arm and hit him in the lower jaw with his closed fist. He did not speak to any of the three students before or after the incident and left the school soon after it occurred.

His friends took the injured student, bleeding from the mouth, to the nurse's office, and an ambulance took him to Methodist Hospital. During three hours of surgery, his teeth were wired shut and the bones in his jaw, which had been broken in four places, were wired together. Although the wires were removed six weeks later, the student's molars continued to be sensitive and physical activity caused pain in his upper teeth. His front tooth was chipped and his doctor was unsure whether there would be a permanent loss of other teeth.

The Hennepin County Attorney filed a juvenile court petition alleging that D.S.F. had committed assault in the third degree. After trial, the court concluded that the petition was proved beyond a reasonable doubt and adjudicated D.S.F. delinquent. At the disposition hearing, the court heard testimony from a probation officer who recommended that D.S.F. be placed in the Hennepin County Home School Alpha Program. The court, stating its reasons on the record, rejected less restrictive dispositions and ordered D.S.F. committed to the Alpha program for 90 days, followed by a term of probation. The court also ordered restitution of $581.13 for the victim's out-of-pocket expenses. D.S.F. appeals, claiming that the evidence of intent is insufficient to support the adjudication of delinquency and the court should have imposed a less restrictive disposition.

## ISSUES

1. Is the evidence of intent sufficient to support the trial court's adjudication of delinquency for third-degree assault?

2. Did the trial court abuse its discretion by failing to order a disposition less restrictive than a 90–day placement in the Alpha program?

## ANALYSIS

### I

■ The offense of assault is defined as the "intentional infliction of or attempt to inflict bodily harm upon another." Minn. Stat. § 609.02, subd. 10(2) (1986). D.S.F. does not dispute that the injured student suffered bodily harm, but denies that he intended to inflict that harm.

The law does not require that the specific result be intended in order to constitute an assault; it is sufficient if the act itself is purposeful and the perpetrator believes the act will result in the bodily harm. Minn. Stat. § 609.02, subd. 9(3) (1986).

D.S.F.'s intent must be determined from all objective facts and circumstances, including his conduct at the time of the act. *State v. Whisonant*, 331 N.W.2d 766, 768 (Minn. 1983). The undisputed evidence establishes that D.S.F., who had substantial experience in karate, grabbed the student by the arm and, with a closed fist, hit him with sufficient force to break his jaw. D.S.F.'s testimony also demonstrates that the

act was purposeful. He admitted that he was not trying to hit a locker and that, although he had second thoughts about hitting the student, he hit him nonetheless.

These facts are sufficient to support a finding on the element of intent beyond a reasonable doubt. *See In re Winship*, 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970); *Matter of Welfare of S.W.T.*, 277 N.W.2d 507 (Minn.1979).

## II

Laws pertaining to an adjudicated delinquent are intended to

> promote the public safety and reduce juvenile delinquency by maintaining the integrity of the substantive law prohibiting certain behavior and by developing individual responsibility for lawful behavior.

Minn.Stat. § 260.011, subd. 2 (1986).

 The goal of disposition in a delinquency case is to rehabilitate the child, and the court's decision must be necessary to achieve that goal. Minn.Stat. § 260.185, subd. 1 (1986). In determining what is necessary, the court must consider the severity of both the act and the proposed disposition. *Matter of Welfare of L.K.W.*, 372 N.W.2d 392, 398 (Minn.Ct.App.1985).

 The transcript of the disposition hearing reveals that the trial court in this case considered both of these factors. The court noted that physical violence against a person is more serious than a property offense, which might not require confinement. In addition, the court observed that despite his karate training, D.S.F. launched an unprovoked, vicious and unjustified attack. The court evaluated the offense as severe.

In evaluating the effect of the disposition on D.S.F., the court found that 90 days would not substantially disrupt D.S.F.'s life and that a disposition which involved only counseling would not be sufficient to trigger rehabilitation—that a specific consequence was necessary to impress upon D.S. F. the seriousness of his behavior. The court stated that D.S.F. needed to learn control of himself in a manner in which his mother, his job, his karate training, and his previous counseling had not taught him. In addition, the court considered the importance of maintaining the integrity of the substantive law and developing individual responsibility. *See* Minn.Stat. § 260.011, subd. 2.

Although the dissent characterizes this disposition as "punitive," the trial court's statements indicate that it was concerned with rehabilitating, rather than punishing, D.S.F. Referring to D.S.F.'s karate training, the court stated:

> People with that kind of power have to be able to control it * * *. But it is obvious that you haven't learned that. * * * [I]f the Court overlooks the behavior because of your past and because * * * this is a single incident, you are likely to reach a conclusion that you don't have to face the consequences of your acts. And the reality of that in the Court's opinion is going to be more helpful than counseling or anything of that kind. Counselors don't have any miracle method of changing people's behavior. Oftentimes the reality of what occurs can have a much greater effect.

The statute also requires that the means used in juvenile dispositions provide opportunities for personal and social growth. Minn.Stat. § 260.011, subd. 2. The court concluded that 90 days in the Alpha program, a closely monitored rehabilitative setting, would not inhibit D.S.F.'s opportunities for growth and agreed that, if possible, D.S.F. could continue his job.

D.S.F. asserts that absent a specific finding that his home life is inadequate, he should not be removed from his home. *See Matter of Welfare of L.K.W.*, 372 N.W.2d at 399–400. However, the preference for allowing children to remain at home applies only to children adjudicated dependent or neglected. Minn.Stat. § 260.011, subd. 2. For a child adjudicated delinquent, supervision in the child's own home is but one of the court's options, to be used when appropriate. Minn.Stat. § 260.185, subd. 1.

The disposition is well within the broad discretion permitted the trial court in delinquency cases. *See* Minn.Stat. § 260.185. The disposition is not arbitrary or dispro-

portionate to the offense, and it is supported by reasonable rehabilitative considerations. We find no abuse of discretion in the court's refusal to impose a less restrictive disposition.

## DECISION

The evidence of juvenile's intent to commit assault was sufficient to support the adjudication of delinquency, and the court did not abuse its discretion by refusing to impose a less restrictive disposition.

Affirmed.

CRIPPEN, J., dissents.

CRIPPEN, Judge, dissenting.

I concur in the decision that the punishment of D.S.F. fits his crime. To explain this decision, his senseless act in November 1986 has been vividly detailed and characterized.

For criminal justice purposes, little more needs to be said.[1] The juvenile's wrongdoing, although an unexpected single offense, provokes a temptation to affirm a straightforward sentencing decision. The record, however, shows a definite abandonment of primary precepts of juvenile law. An affirmance signals the demise of an 80–year-old Minnesota experiment to deal with juvenile delinquency, a system which sacrifices procedural safeguards but pretends to offset this unprecedented lapse in American jurisprudence by making dispositions which respond to an offender's individual needs, not just his offense.

We are confronted here with a purely offense-based determinate sentence of incarceration as a largely predetermined consequence for a serious assault. Unquestionably, D.S.F. has received a determinate sentence. In addition, the sentence was chosen based solely on the occurrence of a serious offense; this opinion reports the personal circumstances of D.S.F., the absence of steps to identify problems leading to his out-of-character act in 1986, and acceptance by the trial court of a settled local court sentencing practice.

In sum, the trial court's disposition raises questions going to the very core of Minnesota juvenile court law. Can American law suffer criminal justice sentencing in a court which denies criminal law safeguards for the accused?

> a. The problem of juvenile court sentencing.

No segment of the American justice system has suffered but still endured the kinds of attacks leveled at our juvenile courts. More than twenty years ago, it became a serious question whether it remained tolerable to permit judicial proceedings that took constitutional guarantees from children and gave nothing in return. *See Kent v. United States*, 383 U.S. 541, 555, 86 S.Ct. 1045, 1054, 16 L.Ed.2d 84 (1966). In 1966 and 1967, the United States Supreme Court set about making demands that children be offered something other than a "kangaroo court." *See, e.g., In re Gault*, 387 U.S. 1, 28, 87 S.Ct. 1428, 1444, 18 L.Ed.2d 527 (1967).

The Supreme Court chose to temper its demands for the juvenile court in 1971. Although children in Pennsylvania presented the Court with a record of juvenile court proceedings "substantially similar to a criminal trial," the Court refused the "wooden approach" of granting children the same rights as adults who encounter

---

1. Remarkably, however, under Minnesota's criminal justice standards, the 90–day sentence of D.S.F. would be appropriate only as a case out of the ordinary, one of a "small number of cases" where sentencing guidelines are ignored because of substantial and compelling aggravating factors. Minnesota Sentencing Guidelines, Comment to § II.D (comment). This offender, who had a criminal history score of zero, would be presumptively entitled to a stayed 12–month sentence. *Id.* II.C. *See id.* IV (sentencing guidelines grid), and V (designating assault in the third degree as a severity level IV offense).

Even with a criminal history score of three, the offender in the adult system would be entitled to a presumptive stay of sentence. *Id.* The fact that D.S.F. is particularly amenable to probationary supervision would be a consideration in determining his sentence in criminal justice proceedings. *See Jackson v. State*, 329 N.W.2d 66, 67 (Minn.1983) (unamenability as a factor for more severe sentence); *State v. Heywood*, 338 N.W.2d 243, 244 (Minn.1983) (particular amenability to probation justifies *downward* dispositional departure).

criminal accusations. *McKeiver v. State of Pennsylvania*, 403 U.S. 528, 541, 91 S.Ct. 1976, 1984, 29 L.Ed.2d 647 (1971). Specifically, the Court found it unnecessary to permit juveniles the right to demand a jury trial when accused of a criminal act. *Id.* at 545, 91 S.Ct. at 1986.

In *McKeiver*, the United States Supreme Court found itself "reluctant to say that, despite disappointments of grave dimensions, [the juvenile court concept] still does not hold promise." *Id.* at 547, 91 S.Ct. at 1987. The Court refused to ignore the prospects "of fairness, of concern, of sympathy, and of paternal attention" contemplated in the juvenile court system. *Id.* at 550, 91 S.Ct. at 1989. Abuses of the system, the Court concluded, "relate to the lack of resources and of dedication rather than to inherent unfairness." *Id.* at 548, 91 S.Ct. at 1987. Justice White, concurring in the majority opinion, found reassurance from "a system eschewing blameworthiness and punishment for evil choice." *Id.* at 552, 91 S.Ct. at 1990. Justice Brennan, also concurring, hoped that "public indignation" might curb excesses of the juvenile court. *Id.* at 555, 91 S.Ct. at 1991.

The Supreme Court in *McKeiver* thought it appropriate to permit the states "to experiment further" in seeking to deal with the problems of young citizens. *Id.* at 547, 91 S.Ct. at 1987. Mr. Justice Harlan thought the majority position was tenable, but only if juvenile delinquency systems were "restructured to fit their original purpose." *Id.* at 557, 91 S.Ct. at 1992. Contrariwise, Mr. Justice White observed, the states were free to chose to use the juvenile justice system for punishment purposes, provided they adopted the corollary practice that criminal court safeguards be extended to juvenile court adjudications. *Id.* at 553, 91 S.Ct. at 1990. Speaking of the future, and the further extension of criminal court safeguards, the majority concluded:

> If the formalities of the criminal adjudicative process are to be superimposed upon the juvenile court system, there is little need for its separate existence. Perhaps that ultimate disillusionment

will come one day, but for the moment we are disinclined to give impetus to it. *Id.* at 551, 91 S.Ct. at 1989.

Since 1971, it has been repeatedly observed, as the United States Supreme Court declared in *Kent*, that children receive the "worst of both worlds," getting "neither the protections accorded to adults nor the solicitous care and regenerative treatment postulated for children." *Kent*, 383 U.S. at 556, 86 S.Ct. at 1054. *See* Feld, *Criminalizing Juvenile Justice: Rules of Procedure for the Juvenile Court*, 69 Minn.L.Rev. 141, 168–69, 275 (1984) (suggesting that abolition of the juvenile court's jurisdiction over criminal and non-criminal misconduct may be desirable, based on observation that children in juvenile court face a punitive system and at the same time are denied fundamental procedural benefits of jury trials and a secure right to counsel); *see also* Feld, *Juvenile Court Legislative Reform and the Serious Young Offender: Dismantling the 'Rehabilitative Ideal,'* 65 Minn.L.Rev. 167 (1981) (calling for juvenile dispositions in an adult criminal system, based on use of fines and determinate sentencing practices for juvenile offenders).

In August 1987, Justice Scott of the Minnesota Supreme Court observed that equal protection of the laws is denied to a juvenile who is not suitable for treatment within the juvenile system and who is denied a request for a jury trial in juvenile court or adult court. *In re Welfare of K.A.A.*, 410 N.W.2d 836, 842 (Minn.1987) (Scott, J., dissenting)). Quoting the United States Supreme Court in *Gault*, 387 U.S. at 13, 87 S.Ct. at 1436, he observed that procedural guarantees of the constitution are not for adults alone. *Id.* at 843. The majority of the court rejected Justice Scott's rationale, concluding that the Juvenile Court Act in Minnesota was founded on a "rational basis" articulated by the legislature for treating juveniles differently than adults. *Id.* at 841. The court referred to the legislative declaration that public safety purposes in delinquency cases "should be pursued through means that are fair and just, that recognize the unique characteristics and needs of children, and that

give children access to opportunities for personal and social growth." Minn.Stat. § 260.011, subd. 2 (1986); *see K.A.A.*, 410 N.W.2d at 838.

Here, three months after the Minnesota Supreme Court's reflections on the constitutionality of the Juvenile Court Act, the premise for toleration of the schemes for handling delinquency cases is obliterated. The statutory purpose highlighted by the supreme court is disregarded.

Deliberate acceptance of offense-based determinate sentencing categorically belies the promises which are the foundation for the 1971 due process analysis of the United States Supreme Court. Appellate affirmation of criminal justice sentencing in the juvenile court unravels the rationale underlying the equal protection analysis of the Minnesota Supreme Court. A system already on the brink of its demise is pushed still closer to a long postponed day of reckoning.

#### b. Options.

There are three plausible choices for a response to punitive dispositional practices of the juvenile court in serious delinquency cases:

1. As Justice Harlan suggested in *McKeiver*, the juvenile delinquency systems could be "restructured to fit their original purpose." *McKeiver v. State of Pennsylvania*, 403 U.S. at 557, 91 S.Ct. at 1992. The appellate courts in Minnesota can be a tool in this restructuring by insisting upon careful adherence to demands of the legislature that juvenile dispositions be designed to serve the individual interests of children and the special interests of their families, not just the public's demands for punishment. I disagree with the decision of the majority to reject this course of action for the court.

2. Alternatively, we can follow the prescription stated by Justice White in *McKeiver*, embracing punitive dispositions

as an acceptable and inherent part of delinquency proceedings, but calling upon the Minnesota Legislature and the Minnesota Supreme Court to extend to accused juveniles all procedural safeguards guaranteed for adults in criminal cases. *See id.* at 553, 91 S.Ct. at 1990. Most critically, we could assert the demonstrated need for jury trials in accusatory proceedings where juveniles may be incarcerated, and the additional need for representation by competent counsel in every case where a juvenile is faced with incarceration.[2] If the majority decision is to stand, we can do no less than make clear what has to be done to facilitate public imposition of punishment.

3. Finally, we can confess the "ultimate disillusionment" the United States Supreme Court thought might one day occur. *Id.* at 551, 91 S.Ct. at 1989. Thus, we could call for dismantling a system that openly exacts from our younger citizens a sacrifice of liberties and gives in return a false promise to serve the best interests of those who come before it. The federal and state constitutions do not permit a criminal justice system without criminal justice safeguards. *See* Feld, 69 Minn.L.Rev. at 275–76 (recommending abolition of juvenile court jurisdiction over criminal and noncriminal misconduct, with benefits for children shaped in the form of shorter sentences and improved programs for incarcerated youths). Many who address these issues, including the author of this opinion, are reluctant to support this step, hoping still that the system can discipline itself to be faithful to its purposes and promises. That reluctance is not an option in light of the decision to affirm the disposition of this case.

Is there another option? Can we accept as merely unfortunate a system meting out punishment without fundamental constitutional safeguards? There is no such option, unless we are to count merely unfortunate the repeated, deliberate choice to

---

**2.** "[T]he one inescapable fact of juvenile justice administration in Minnesota is that a majority of all youths prosecuted as delinquents are not represented by counsel during the process. Nearly half the juveniles charged with felonies and more than a quarter of those sentenced to correctional facilities had no lawyer, and the county-by-county variations in rates of representation suggest that nonrepresentation reflects judicial policies rather than youthful competencies." Feld, 69 Minn.L.Rev. at 189–90 (citations omitted).

deny citizenship and personhood to a major class of American people, all of those who are under the age of majority. This is not a tolerable posture.

[N]either the Fourteenth Amendment nor the Bill of Rights is for adults alone. *McKeiver*, 403 U.S. at 532, 91 S.Ct. at 1979 (quoting *Gault*, 387 U.S. at 13, 87 S.Ct. at 1436). Separate, inadequate safeguards for proceedings leading to incarceration of children is "a plain denial of equal protection of the laws—an invidious discrimination." *Gault*, 387 U.S. at 61, 87 S.Ct. at 1461 (Black, J., concurring). In addition, insult to the personhood of children carries with it an equally untenable disrespect for parents and other family members who count their own interests wholly intertwined with those of the child in trouble.

The first of the three options is available to us, and it should be conscientiously pursued. The trial court has not utilized standards mandated by existing statutes. We should remand these proceedings for a disposition crafted so as to take careful account of the legislative purpose to recognize the unique characteristics and needs of D.S.F. and provide for services or supervision, beneficial to the juvenile and his family, that enhance his personal and social growth.

It is imagiable, of course, that a disposition under governing juvenile laws would lead to involvement of D.S.F. in a residential treatment program. Such a decision, however, would follow identification of pertinent needs of the juvenile, determination that a particular program would be suitable for response to those needs and beneficial for the juvenile and his family, and a considered decision that this step had more advantages than nonresidential supervision.

If a remand is rejected, if our statutes permit or require the trial court's sentencing decision, we are witnessing an anomalous judicial system which is intolerable under either the United States Constitution or the constitution of this state. If existing statutory law compels or permits the result reached here, we should implore here and now, without waiting for more experimentation, that all criminal should be guaranteed in juvenile delinquency proceedings, or alternatively, that juvenile court jurisdiction over childhood offenses be abolished.

The foregoing conclusions are based on the following analysis of the facts and the law of this case.

c. Trial court disposition.

In 1976, the Minnesota Legislature mandated that all delinquency dispositions include trial court findings to show, *inter alia*, "why the best interests of the child are served by the disposition ordered." Minn.Stat. § 260.185, subd. 1(h) (1986). *See* 1976 Minn. Laws ch. 150, § 1. Twice before we have been called upon to apply this statute, but this is the first instance requiring an application of the statute to a serious delinquent act. *See In re Welfare of L.K.W.*, 372 N.W.2d 392, 399–401 (Minn. Ct.App.1985) (reversing disposition of residential placement 15 months after shoplifting offense); *In re Welfare of M.R.S.*, 400 N.W.2d 147, 151–52 (Minn.Ct.App.1987) (reversal of hospital placement following adjudication of juvenile petty offenses and two misdemeanors).

In *L.K.W.*, addressing the statutory reference to the child's best interests, we found two included standards. First, we said that a residential placement must be found suitable for the needs of the child.[3] 372 N.W.2d at 400. Second, we found that the law preferred a home placement, so that removal was appropriate only in cases of unusually severe needs of the child.[4] *Id.* at 401.

---

**3.** In the course of review in the immediate case, it became evident that we erred in *L.K.W.* when discussing suitable placements by referring to a statement of legislative purposes that since 1980 has been confined to dependency and neglect cases. The statement of purpose for delinquency cases is even more specific, however, calling for actions that "recognize the unique characteristics and needs of children, and that give children access to opportunities for personal and social growth." Minn.Stat. § 260.011, subd. 2.

**4.** It is evident we erred in *L.K.W.* in partially attributing the preference against removal to language in part of the purpose statement now in reference to dependency and neglect cases. It is true as a matter of public policy, nevertheless, that the best interests of the child are

Is incarceration suitable for D.S.F.? Does it meet his needs and contribute to his growth? Does it utilize and benefit the juvenile's primary resource, his family?

It is undisputed here that D.S.F., now an adult, has no identified social problem except for a wholly wrongful act on November 12, 1986. He lives with his mother, and the trial court observed that she furnished very capable and well-meaning supervision. D.S.F. participates in an out-patient counseling program with his mother. It is undisputed that D.S.F. is a nice appearing, pleasant, cooperative person. The court observed that he was remorseful for his unlawful act in November 1986. Appellant is completing his high school work, plans to attend college, has a chosen career, and the academic and intellectual ability to achieve at a high level. A counselor who has dealt with appellant and his mother is confident that his misbehavior will not recur and has explained the difficult experience that D.S.F. encountered late in 1986 when the family was contacted by his father, who the boy had not seen for 12 years. Appellant's employer furnished a recommendation to the court praising D.S.F.'s performance as an appliance sales employee. There is no question that appellant is to make restitution for medical expenses incurred by the individual he hit. Counseling services, schooling and employment of D.S.F. will be interrupted by incarceration.[5]

The trial court concluded that it would be appropriate to impose an offense-based determinate sentence. As said earlier, the court's sentencing rationale is defensible in terms of fundamental notions of criminal justice. Explaining its disposition, the court concluded:

So the Court feels that under all the circumstances you have to recognize that these are the consequences that result from behavior of that kind, even though, hopefully, you will never do it again. I

am satisfied that it is your intent now to never let it happen again, but in the Court's opinion that is insufficient.

The court's only formal findings expressed the same conclusion:

Alternatives considered and rejected due to the extreme violent nature of the assault and the complete lack of provocation or excuse for attacking the victim, evidencing respondent's immaturity to handle and control the power forces learned as the holder of a karate green belt. Court considered it necessary to have respondent subject to the services provided by the county home school Alpha program.

Social reports did not state an opinion on which social or emotional factors led to an angry and justified act of D.S.F. in November 1986. Thus, it has not been decided what kind of treatment or services might be necessary to assist him. Relevant to the recommended disposition, a probation officer observed only that appellant's serious offense needed further "in depth attention" and that the availability of that attention, taken together with the seriousness of the offense, justified a stay at the county home school for a set term. The trial court concluded only that incarceration was important so that appellant would suffer consequences for his misconduct.

Making the issue here even more serious, it is evident that a determinate sentence of incarceration imposed by the trial court was prompted by unpublished sentencing guidelines, based singularly on the offense committed, and not by the spontaneous exercise of discretion by the presiding judge. The trial court rejected arguments which would lead to departure from an established policy to incarcerate youths for serious offenses.

The prosecutor advised the presiding judge of the court's dispositional practices,

---

normally served by parental custody. *In re Welfare of A.R.W. & Y.C.W.*, 268 N.W.2d 414, 417 (Minn.1978), *cert. denied*, 439 U.S. 989, 99 S.Ct. 588, 58 L.Ed.2d 663 (1978).

**5.** Counsel for the juvenile requested that D.S.F. continue on his job during his 90–day sentence, if that could be arranged. The trial court stated

it had no objection to this arrangement, if it was consistent with the County Home School program. The record does not indicate that a work-release program is permitted at the county institution, and the trial court left that topic to the discretion of the institution director.

comments evidently prompted by the fact that the trial judge was a retired district court judge serving by special appointment. It is the practice of "this court," the prosecutor reported, for "this type of offense," to "sentence" the juvenile to a term of 180 days at the county facility. The prosecutor proposed that a 90–day term was sufficient for this case, suggesting at least a modicum of flexibility, relative to the duration of sentences.

Inescapably, it must be concluded that we are dealing here with a criminal justice sentence, not a juvenile court disposition aimed at doing what is best for the individual. The juvenile has been ordered incarcerated for a definite term as part of a predetermined sentencing practice.

Is it fair to say that appellant is being incarcerated? It is undoubtedly true that the trial court had reason to assume that rehabilitative steps would be taken while appellant is kept in a county juvenile facility. For good correctional reasons, juvenile offenders are segregated from adult offenders when kept in custody. Keeping these things in mind, it is nevertheless true that appellant suffers a complete loss of liberties when kept in a juvenile facility. The sentence is a set term of incarceration:

> The fact of the matter is that, however euphemistic the title, a "receiving home" or an "industrial school" for juveniles is an institution of confinement in which the child is incarcerated for a greater or lesser time.

*In re Gault,* 387 U.S. at 27, 87 S.Ct. at 1443.

Of course, it may be asserted that a punitive sentence is in the best interests of D.S.F., that it is for his own good. A probation officer expressed her hope that the recommended disposition would help appellant recognize what triggers his anger and to learn what he could do to avoid any similar misconduct. The trial court observed that facing consequences would be "more helpful to D.S.F. than counseling." In addition, the trial court assured D.S.F.: "90 days is not going to have any substantial impact on the rest of your life." Although there is deceit in systematically

pursuing care with tools of punishment, it cannot be disputed that there may be theraputic aims in a purely punitive sentence. That fact, however, makes the disposition no less punitive. *See* Feld, 69 Minn.L.Rev. at 253 (punishment requires certain procedural safeguards whether or not it is beneficial).

The disposition here cannot be reconciled with the best interests standard of Minn. Stat. § 260.185, subd. 1. It cannot be reconciled with the statutory purpose to recognize the needs of children and to. contribute to their personal and social growth.

The legislature has not repealed its 1976 declaration that delinquency dispositions are to be crafted to serve the best interests of the child. Until that declaration is repealed, there is no cause to take the step we are taking today.

In 1980, the Minnesota Legislature modified the statement of purposes for delinquency cases, saying that juvenile delinquency law is designed "to promote the public safety and reduce juvenile delinquency by maintaining the integrity of the substantive law prohibiting certain behavior and by developing individual responsibility for lawful behavior." Minn.Stat. § 260.011, subd. 2 (1986); *see* 1980 Minn. Laws ch. 580, § 3. It is true that some may find in these words an invitation to consider punitive dispositions. It is also true, however, that the legislature went on to declare that juvenile courts are to "recognize the unique characteristics and needs of children," and to "give children access to opportunities for personal and social growth." *Id.* Furthermore, as just observed, the legislature in 1980 did not repeal its choice of the best interests standard for delinquency dispositions.

Significantly, 1980 amendments included a provision permitting fines in juvenile delinquency cases. *See* Feld, 65 Minn.L.Rev. at 231–32 (discussing punitive dispositions permitted by 1980 legislation); *see* Minn. Stat. § 260.185, subd. 1(f) (1986); *see also* 1980 Minn. Laws ch. 580, § 17. The use of the purely punitive fine harmonizes with the pattern of punitive incarcerations. The facts of this case do not require that we

consider the procedural safeguards to be employed before imposition of a fine. The immediate case involves incarceration, and the fine provision should not be given collateral importance as a declaration that punitive incarceration is now a legislated part of Minnesota's juvenile justice system.

### d. The decision to affirm.

As indicated earlier, it has been observed that recent changes in legislation make it clear punitive remedies are an accepted part of the Minnesota juvenile justice system, so that present circumstances call for granting abolition of juvenile court jurisdiction over youthful offenders. *See* Feld, 65 Minn.L.Rev. at 167–69. The majority affirms a punitive sentence in the juvenile court system, and its views are thus in harmony with this analysis of the Juvenile Court Act.

Before today's decision, it could be said that Professor Feld's analysis of our statutory law was erroneous. According to existing statutory law, we can and should require an individualized disposition suitable for appellant and his family. In light of the decision of the majority, however, Professor Feld's prescription, abolition of juvenile court jurisdiction over youthful offenders, or equivalent correction within the juvenile justice system, is clearly appropriate.

I respectfully dissent.