**In the Matter of the WELFARE
OF J.A.J., Child.**

No. C5–95–2203.

Court of Appeals of Minnesota.

April 9, 1996.

Hubert H. Humphrey, III, Attorney General, St. Paul, Robert M.A. Johnson, Anoka County Attorney, Robert D. Goodell, Assistant Anoka County Attorney, Anoka, for respondent State.

James Diamond, Special Assistant State Public Defender, Minneapolis, for appellant J.A.J.

Considered and decided by AMUNDSON, P.J., and CRIPPEN and WILLIS, JJ.

## OPINION

AMUNDSON, Judge.

Appellant J.A.J. challenges a disposition order on a juvenile delinquency adjudication of indecent exposure. The trial court ordered J.A.J. into a residential treatment program. J.A.J. argues that (1) the disposition order was an abuse of discretion, and (2) the trial court's written findings were insufficient. We reverse.

## FACTS

Appellant J.A.J. was charged by a delinquency petition with fourth-degree criminal sexual conduct, committed against his sister on October 29, 1993, at his mother's home in Hennepin County. The petition was amended to add a count of fifth-degree criminal sexual conduct. Later, the state amended the petition to charge indecent exposure, and on September 8, 1994, J.A.J. admitted to this charge in the petition.

The prosecutor explained that, as part of the agreement, the matter was to be referred to Anoka County, where J.A.J. lived with his father. The prosecutor also noted that

> the parties anticipate that there be no out-of-home placement; however, we would anticipate that there be some further field study or some other kind of follow-up concerning this matter by Anoka County.

The Hennepin County court noted in its order: "No out of home placement contemplated."

An initial disposition hearing was held in February 1995, at which the probation officer recommended that J.A.J. be placed on probation for six months and complete a sex offender assessment at the PHASE program. Over defense counsel's objection to a sex offender program, the court ordered the PHASE assessment.

The PHASE report was completed in June 1995. The report noted J.A.J.'s family problems and his emotional and behavioral difficulties. The report recommended that J.A.J. take a polygraph examination in order to help him evaluate his offense behavior more honestly. The report also recommended that J.A.J. be placed in a residential treatment center with a sex-specific component.

The probation officer completed an adjustment report based in part on the PHASE evaluation. Although this report noted that J.A.J. had not committed any probation violations, it recommended that he be temporarily detained pending a review hearing and that he be given a polygraph test concerning the October 1993 incident. The probation officer later submitted a report addendum stating that J.A.J. had failed the polygraph test. He

submitted a new recommendation that J.A.J. be placed at the Mille Lacs Academy Residential Treatment Program.

Another disposition hearing was held in August 1995. The probation officer testified that Mille Lacs Academy works with sex offenders, doing psychological evaluations and providing treatment with a sex-specific component. He also testified that inpatient treatment was in J.A.J.'s best interests because he lacked self-identity, and the best solution was to place him somewhere other than the home of either parent. He testified that an outpatient program was not intense enough for J.A.J.'s needs.

The trial court issued an order adopting the probation officer's recommendation. The court found

> that it is in the best interests of the child to be placed in a residential treatment center to address his present personality and psychological disorders. Further, the Court finds that an outpatient treatment environment shall not meet the needs of the child.

This appeal followed.

## ISSUES

1. Is the trial court's disposition order an abuse of discretion?

2. Are the trial court's written findings sufficient?

## ANALYSIS

### I. *Disposition*

■ J.A.J. argues that the trial court's disposition, which sent him to Mille Lacs Academy for inpatient sex offender treatment, was not the least restrictive alternative available, was not in his best interests, and was imposed in violation of an agreement in Hennepin County that excluded any out-of-home placement.

■ The trial court has broad discretion in choosing the appropriate juvenile delinquency disposition. *In re Welfare of L.K.W.*, 372 N.W.2d 392, 397 (Minn.App.1985). This court will affirm the disposition as long as it is not arbitrary. *Id.* Findings of fact in the dispositional order will be accepted unless clearly erroneous. *Id.* Absent a clear abuse of discretion, a trial court's disposition will not be disturbed. *In re Welfare of M.A.C.*, 455 N.W.2d 494, 498 (Minn.App.1990).

■ We conclude that it was an abuse of discretion to order a juvenile who was adjudicated for indecent exposure, and had no new offenses or probation violations in the nearly two years following the offense, into residential treatment.

■ At the disposition hearing, the state argued that there was no necessary link between the seriousness of the offense of adjudication and the severity of the disposition. But in *L.K.W.*, this court stated:

> To measure what [disposition] is necessary, a trial court must assess two factors, the severity of the child's delinquency, and the severity of the proposed remedy. When the severity of intervention is disproportionate to the severity of the problem, the intervention is not necessary and cannot lawfully occur. The court must take the least drastic necessary step.

372 N.W.2d at 398.

■ At the initial disposition hearing, the trial court properly ordered a sex offender evaluation for J.A.J. *See* Minn.Stat. § 260.185, subd. 1(h) (1994) (court to order sex offender evaluation upon adjudication for indecent exposure, among other offenses). But the PHASE evaluation focuses primarily on J.A.J.'s family problems and his emotional problems due to family dysfunction. The evaluation does not identify any sexual problem requiring any treatment, let alone residential treatment. The Sexual Attitudes Questionnaire administered by PHASE showed no inappropriate responses (except one projecting blame on victims of sexual assault). Because J.A.J. blamed his sister for initiating the sexual incident, that response reflects nothing more than his denial of the original criminal sexual conduct charges.

■ In contrast to the minimal discussion of sexual issues in both the PHASE report and the probation officer's report, there is extensive discussion of J.A.J.'s family problems. This court has criticized the use of a

delinquency disposition "as a means to resolve the parents' custody dispute." *See L.K.W.*, 372 N.W.2d at 398–99. Here, although there may be evidence of family dysfunction far deeper than a custody dispute, the trial court has no discretion to use a delinquency disposition to solve those problems.

The PHASE evaluation team expressed its concern about J.A.J.'s custody. The probation officer emphasized the need to pursue J.A.J.'s best interests rather than the interests of his parents. The probation officer suggested that after the Mille Lacs Academy program, the Anoka County Corrections Department might attempt to solve the custody problem.

Adults facing criminal sentencing for an offense similar to J.A.J.'s would not face a harsher sentence based on an assessment of their living arrangements. Neither would they be sanctioned for the faults of their parents or the parents' noncooperation with the court system.

 A delinquency disposition must serve the child's best interests. Minn.Stat. § 260.185, subd. 1. But this court has held that the "best interests" standard does not supersede the requirement that the disposition be "necessary." *L.K.W.*, 372 N.W.2d at 399. In other words, this court explained:

> The promise of benefits in a disposition, that the choice would be good or even best, does not permit an action which is not necessary.

*Id.* A disposition must be "necessary to the rehabilitation of the child," and "necessary to restore law-abiding conduct in the juvenile." Minn.Stat. § 260.185, subd. 1 (1994); *In re Welfare of M.R.S.*, 400 N.W.2d 147, 151 (Minn.App.1987). That a certain disposition may be desirable in a "holistic" sense, as the probation officer expressed in this case, does not make it "necessary" to restore a juvenile to law-abiding behavior.

Even on appeal, the state has failed to point to any evidence showing that J.A.J. has a sexual problem requiring treatment. The trial court's order itself states that treatment is needed for "personality and psychological disorders." Although the offense itself may suggest a possible need for sex offender treatment, the sex offender evaluation ordered for the specific purpose of deciding that question fails to substantiate it. Without such evidence, the disposition order is supported only by findings of family dysfunction more appropriately addressed in a child protection proceeding.

## II. *Findings*

 J.A.J. argues that the trial court's written findings are inadequate because they do not show why less restrictive alternatives were rejected. *See* Minn.Stat. § 260.185, subd. 1 (court must make written findings on what alternative dispositions were considered and why they were not appropriate); *M.A.C.*, 455 N.W.2d at 499 (failure to make statutorily required findings constitutes reversible error). We agree. The bare statement that the best interests of a child require the disposition is insufficient. *See M.R.S.*, 400 N.W.2d at 151 ("best interests" finding with minimal elaboration was inadequate). Although the state urges this court to disregard any inadequacies in the findings in this case, those inadequacies point to a fundamental problem, the lack of any evidence that J.A.J. has a sexual problem, as opposed to a family problem, that requires residential treatment.

Given our reversal of the disposition order, we need not decide whether a remand for the statutorily-mandated findings is required. We do note that nothing stated in this opinion is intended to preclude the state from commencing a child protection proceeding at any time.

## DECISION

The trial court abused its discretion in ordering residential sex offender treatment as a disposition for appellant's juvenile delinquency adjudication. The trial court's written findings are inadequate because they do not show why less restrictive alternatives were rejected.

**Reversed.**

CRIPPEN, Judge (concurring specially).

## I.

I concur in the conclusions that state law did not permit the residential confinement of J.A.J. because (a) the trial court failed to find that this disposition was "necessary to the rehabilitation of the child" and (b) the record does not contain facts that would support such a finding. *See* Minn.Stat. § 260.185, subd. 1 (1994) (stating overall dispositional standard of necessity). But we have a duty to catalogue the disregard in this case for several additional juvenile court rubrics on out-of-home placements of children. And we have a larger responsibility to examine a more vital issue, one that makes the welfare of J.A.J. a matter of remarkable importance. The disposition in this case offends fundamental, minimum standards of substantive due process.[1]

Because of the inattention to the constitution and other basic standards that is evident in this case, the disposition is singularly unacceptable. The issue is not about technical rights of the child, asserted to trump vital functions of government. Rather, the case involves essential liberty, the freedom against being taken from your home, incarcerated, and then confined in a mental health facility for an indeterminate term, all without a showing of cause. And the case does not speak alone to risks connected with decisions to take action. When "doing good" replaces meaningful standards and good process in a caring system, there are equal risks that nothing is done in cases where remedial steps are both critical and justified.

There is also an issue here that is larger than the freedom of J.A.J. The case reveals or at least suggests a dangerous legal culture in the juvenile justice system. The illegal taking of J.A.J.'s liberty should prompt, at a minimum, strict scrutiny of the system that produced it.

For 30 years, since Justice Abe Fortas's landmark opinions in *Kent* and *Gault*,[2] a reform movement has labored to impose basic principles of procedural due process on the juvenile justice system. Some students of the subject, observing the apparent immunity of the system to procedural reform, think its reason for being is now in question.[3] The author of this opinion has been among those who have defended the existence of the juvenile court because of its continuing potential for doing rehabilitative work and preventing future public safety problems.[4]

The disposition imposed on J.A.J. shows need for a new urgency in calls for change or

1. That this concurrence addresses issues in addition to those in the parties' briefs does not render the concerns discussed in the opinion either legally extraneous or practically irrelevant. The "interest of justice" determines the scope of our review. Minn.R.Civ.App.P. 103.04. It is our "responsibility" to decide cases according to the law, a duty that is not diminished by what is addressed by counsel. *State v. Hannuksela*, 452 N.W.2d 668, 673 n. 7 (Minn.1990) (citation omitted); *see Greenbush State Bank v. Stephens*, 463 N.W.2d 303, 306 n. 1 (Minn.App.1990) (applying *Hannuksela* in a civil case), *review denied* (Minn. Feb. 4, 1991). It is the appellate court's "duty" to consider and determine a case on the ground of illegality, "although such ground was neither presented to nor considered by the trial court, if such illegality (a) is apparent upon undisputed facts, (b) is in clear contravention of public policy, and (c) if a decision thereon will be decisive of the controversy on its merits." *Atwood v. Holmes*, 229 Minn. 37, 41–42, 38 N.W.2d 62, 65–66 (1949) (citations omitted).

2. *Kent v. United States*, 383 U.S. 541, 86 S.Ct. 1045, 16 L.Ed.2d 84 (1966); *In re Gault*, 387 U.S. 1, 87 S.Ct. 1428, 18 L.Ed.2d 527 (1967).

3. Barry C. Feld, *The Transformation of the Juvenile Court*, 75 Minn.L.Rev. 691, 692–93 (1991). Professor Feld observes:

 The substantive and procedural convergence between juvenile and criminal courts eliminates virtually all of the differences in strategies of social control between youths and adults. As a result, no reason remains to maintain a separate juvenile court whose only distinction is its persisting procedural deficiencies. Yet, even with the juvenile court's transformation from an informal, rehabilitative agency into a scaled-down criminal court, it *continues to operate virtually unreformed*. The juvenile court's continued existence despite these changes reflects an ambivalence about children and their control, and provides an opportunity to re-examine basic assumptions about the nature and competence of young people.

4. Frank A. Orlando & Gary L. Crippen, *The Rights of Children and the Juvenile Court*, in *Juvenile Justice and Public Policy* 89, 96–97 (Ira M. Schwartz ed., 1992).

abolition of the juvenile justice system. And it prompts adding to the agenda of reform the critical topic of limits on dispositional choices. Despite modern procedural reforms, we continue to provide for children a system of justice that demonstrates the capacity for human rights abuses, a form of public action that we are apt to associate with the underdeveloped civil rights in certain foreign nations whose practices we vigorously condemn. In this case, the right to counsel and the worthy service of a competent public defender accomplished little to control the handling of the case in the juvenile court.[5]

This opinion first restates the facts of the case, to describe what happened but also for the purpose of trying to understand why the substantive standards that should protect J.A.J.'s liberty were so systematically cast aside. The next section of the opinion reviews the constitutional law that was either not asserted or asserted but not applied to protect the basic liberty interests of J.A.J. Finally, I include a list, I hope complete, of the drastic statutory and rule violations that occurred in the course of J.A.J.'s tenure in the juvenile system.

## II.

Before further exploring the facts, one thing about them should be made clear. Although there can be no doubt that the child's liberty interests were wrongfully and severely damaged, no evidence reveals that this violation resulted from a design to be hurtful. Nor is this case an example of excessive zeal for punishment. The record does suggest inappropriate assumptions of fact on matters of domestic conflict and sexual behavior and an overlarge zeal to act forcefully on those subjects. But the record primarily demonstrates an abundance of good intention, coupled dangerously with insensibility to the risk that the infliction of unnecessary "care" may greatly harm the "beneficiary" and arbitrarily sacrifice his basic freedoms. In this latter respect, our understanding is apt to be improved by reflecting on advice sounded 50 years ago by an English literary icon writing in a remote Australian law journal:

> It may be said that * * * humanitarians are not punishing, not inflicting, only healing. But do not be deceived by a name. To be taken without consent from my home and friends; to lose my liberty; to undergo all those assaults on my personality which modern psychotherapy knows how to deliver; to be re-made after some pattern of 'normality' hatched in a Viennese laboratory to which I never professed allegiance; to know that this process will never end until either my captors have succeeded or I grown wise enough to cheat them with apparent success—who cares whether this is called punishment or not? That it includes most of the elements for which any punishment is feared—shame, exile, bondage and years eaten by the locust—is obvious. Only enormous ill-desert could justify it; but ill-desert is the very conception which the humanitarian theory has thrown overboard.

> \* \* \* \* \* \*

> Mercy, detached from justice, grows unmerciful. This is the important paradox * * * * We ought long ago to have learned our lesson. We should be too old now to be deceived by those human pretensions which have served to usher in every cruelty of the revolutionary period in which we live.[6]

With those observations at hand, this is the record on the pertinent experiences of J.A.J. since about 1991.

---

**5.** *See* Barry C. Feld, *The Right To Counsel in Juvenile Court: An Empirical Study of When Lawyers Appear and the Difference They Make,* 79 J.Crim.L. & Criminology 1185 (1989).

**6.** C.S. Lewis, *The Humanitarian Theory of Punishment,* 20th Century: An Australian Quarterly Review. III(3)(1947). The observation of Lewis is not foreign to the annals of American law: Experience should teach us to be most on our guard to protect liberty when the government's purposes are beneficent. Men born to freedom are naturally alert to repel invasion of their liberty by evil-minded rulers. The greatest dangers to liberty lurk in insidious encroachment by men of zeal, well-meaning but without understanding. *Olmstead v. United States,* 277 U.S. 438, 479, 48 S.Ct. 564, 572–73, 72 L.Ed. 944 (1927)(Brandeis, J., dissenting).

The child was first charged in a Hennepin County delinquency petition with committing sexual conduct against his half-sister two and one-half years ago, on October 29, 1993, when she was twelve and he was fourteen.

The Hennepin County petition was later amended to charge indecent exposure, and on September 8, 1994, J.A.J. admitted to committing this offense. The state dismissed the earlier petition that had charged J.A.J. with fourth and fifth degree criminal sexual conduct. The prosecutor explained that, as part of the agreement, the petition was to be referred for disposition to Anoka County, where J.A.J. lived with his father. The prosecutor also noted that "the parties anticipate that there be no out-of-home placement," although dispositional work would be performed in the receiving county. The order transferring venue to Anoka County was issued on December 1, 1994.

A disposition hearing was held in Anoka County on February 6, 1995. J.A.J. had lived with his father since late 1993. The probation officer recommended that J.A.J. be placed on probation for six months and that he also be ordered to complete a sex offender evaluation at the PHASE program and return to court for a review of the agency report. Defense counsel objected to the recommendation, arguing that J.A.J. was now in counseling at school and that ordering a sex offender evaluation would ignore the fact that he had admitted only to indecent exposure. The juvenile court ordered the PHASE evaluation as recommended.

In July 1995, the Anoka County probation officer reported again to the court and a hearing occurred. On July 14, 1995, the court ordered J.A.J. placed in the Anoka County Juvenile Center Secure Detention. J.A.J. was again ordered placed in secure detention on July 29, 1995. Neither secure detention order contains any finding of fact or other statement of the reasons for secure detention. Secure detention was continued in August disposition orders, again without a court explanation on the topic.

Social reports indicate that a probation officer recommended secure detention because J.A.J.'s father vigorously opposed a further disposition, and detention would be

"the kindest thing we can do for (J.A.J.)." The probation report indicates that the officer's antipathy or concern toward J.A.J.'s father was fueled by comments of the boy's mother speculating that the father might abscond with J.A.J. to avoid a further disposition.

A hearing to review the PHASE recommendations was held on August 4, 1995, six months after the evaluation was ordered and 22 months after the offense. The prosecutor submitted the evaluation report to the court and offered testimony of the probation officer who had prepared the correction department's disposition reports.

The PHASE evaluation, authored in principal part by a staff person whose professional credentials, if any, were not stated in or inferable from the report, cited no sexual problem of J.A.J., except an opinion that the boy minimized the indecent exposure adjudication by putting much of the responsibility for the incident on his sister. The evaluation detailed the dysfunction of J.A.J.'s family and concluded that J.A.J. has continuing "emotional and behavioral problems" resulting from that dysfunction. The evaluation also expressed concern about J.A.J.'s custody situation, but identified no misbehavior, sexual or otherwise, after the adjudicated offense. The evaluation recommended residential treatment for J.A.J.

The probation officer's report noted that J.A.J. had had no probation violations, that he was doing well in school, and that he had a part-time job. It detailed J.A.J.'s father's opposition to further treatment programs for his son and recommended placement at the Mille Lacs Academy residential treatment program, with further secure detention until J.A.J. could be placed there. The report stated that the residential facility offered psychiatric care, including evaluation and monitoring, and "sex specific" counseling. Regarding the proposed disposition, the probation officer noted that "J.A.J. does appear rather disturbed and significantly stressed."

The probation officer, Quentin Kurtz, testified that in making a recommendation he does not concern himself with the seriousness of the juvenile's offense, but looks in-

stead at the child's needs. He testified that he had taken a "holistic" look at J.A.J.'s needs, which included concerns about conflict within his family, emotional problems, and concerns about his physical safety. Kurtz testified that J.A.J. had been attending the recommended outpatient program, but that the family was not cooperating in the family component of the program.

Kurtz testified that his recommendation was to send J.A.J. to Mille Lacs Academy, a residential treatment facility that works with "sex offenders." He testified that this recommendation for residential treatment was in J.A.J.'s best interests because J.A.J. had no self-identity and would best be placed somewhere other than the home of either parent. Kurtz noted in his report that there had been, to his knowledge, no probation violations, not even a violation of the 7:00 p.m. curfew. He also noted that J.A.J. had a "rather good record" in high school, maintaining C grades.

In support of the recommendation for long-term residential treatment, the prosecutor pointed to J.A.J.'s failure to admit to sexually assaulting his half-sister; a report that J.A.J. may have been sexually abused as a youngster, which could affect his own sexuality; "high family dysfunction" involving disputes between his divorced parents; J.A.J.'s unresolved grief about the death of another half-sister; and reports that J.A.J. had engaged in self-harm some years earlier. These factors, the prosecutor argued, "rebut [the suggestion of defense counsel that] the recommendation for residential treatment is out of order and over zealous." According to the PHASE report, the prosecutor interpreted, "in order for [J.A.J.] to get on with it and improve, he needs to address his own responses."

In further support of the probation officer's recommendations, the prosecutor asserted: "(T)he purpose of juvenile court is not to say you committed 'X' level offense and you get 'X' level consequence." She continued:

> The purpose of the juvenile court is while they, we still have an opportunity to do so, to provide the right treatment for a juvenile, to overcome whatever background

he's been in that's made him the way he is, and to get him on the right track so he won't end up on the adult system.

Defense counsel argued that J.A.J. was before the court only to receive a disposition appropriate for an indecent exposure adjudication. He observed that "the dispute between the parents should be properly addressed in a CHIPS case if they feel so strongly about that," and that J.A.J.'s placement in residential treatment was neither reasonable nor justified by the 1993 misdemeanor adjudication. The juvenile court informed counsel he was making this argument in the wrong forum:

> I'm looking at a disposition at this time. Not what happened. Not any of the underlying facts. It's going in one ear and out the other. That is passe. That is history. * * * What is good for this individual; what recommendations are you making as far as disposition; that's what the court is looking at. * * * Do you have documents to submit, as far as what should happen as far as disposition? And that's what we're here for, and I'm limiting you to that.

Defense counsel explained that he only asked for a disposition proportional to the offense, and he then argued that J.A.J. should remain in the custody of his father, based on how well the juvenile had done there for so long. Counsel informed the court that both J.A.J. and his father would agree to outpatient treatment.

The juvenile court issued an order on August 11, 1995, adopting the probation officer's recommendations. The court found that it was in J.A.J.'s best interests to be placed in residential treatment "to address his present personality and psychological disorders." The court made the conclusory finding that outpatient treatment would not meet J.A.J.'s needs. The court did not address or acknowledge any inconsistency between its assumption that J.A.J. needed mental health and sex offender treatment and the PHASE evaluation's failure to state a medical diagnosis or to state that J.A.J. had a sexual problem. Further, again without explanation, the court ordered secure detention for J.A.J. at

the Anoka County Juvenile Center while awaiting placement at Mille Lacs Academy. The court did not set any termination date for the order or for J.A.J.'s treatment at Mille Lacs Academy. No review of the disposition was set until August 10, 1996.

After this appeal was filed, the court granted the state's request that medications could be administered to J.A.J. "as directed" by the residential treatment center physician and by corrections staff, despite the fact that J.A.J. had yet to be diagnosed with a sexual pathology or psychological illness. The medication order states that J.A.J. had been "classified as depressed and in need of this medication." After the order was filed, J.A.J. filed an objection to the medication order and a request for a formal review hearing.

### III.

In a letter argument to the juvenile court, J.A.J.'s public defender began to uncover the problems with the juvenile justice system's disposition of J.A.J.:

> The theory of correction and juvenile justice that the State suggests undermines a bedrock principle of a society which values justice. The State is asking this Court to completely abandon the theory of sentencing in accordance with the seriousness of the offense. They insist that because we employ a slightly different vocabulary in the juvenile system (e.g. Disposition instead of sentencing) and strive for rehabilitation and not merely retribution that we are free to use any type of seriousness of offense to get the child the type of "help" the State deems appropriate. When this theory is employed on adults in countries other than our own we refer to this method of subjective incarceration as a human rights abuse, even if the offending regime insists that it is for rehabilitation. Is there something that makes the rights and liberties of our children less worthy of protection or is the State asking this court to ignore the harsh punishment which 12 to 18 months of residential treatment imposes? * * * [This Court] must also consider that if an adult were before this Court on the very same admitted conduct it could

not deprive that adult of his or her liberty for more than 90 days.

The public defender's argument might be counted an understatement in the sense that it overlooks vital principles of American constitutional law. That none of the public officials who worked on J.A.J.'s case gave heed to his rights according to the due process guarantees of the United States Constitution and the Minnesota Constitution reveals precisely how grave and fundamental are the problems plaguing the juvenile justice system.

The Fifth Amendment to the U.S. Constitution, applied to the states through the Fourteenth Amendment, provides that "[n]o person shall * * * be deprived of life liberty, or property, without due process of law * * *." U.S. Const. amend. V; *see also* Minn. Const. art. I, § 7 ("No person shall be * * * deprived of life, liberty or property without due process of law.").

In committing J.A.J. on a parole officer's recommendation of this "help" to the child, the juvenile court proceeded in conflict with explicit United States Supreme Court holdings that confinement for mental health therapy is a "massive curtailment of liberty" under the Fifth Amendment. *Humphrey v. Cady,* 405 U.S. 504, 509, 92 S.Ct. 1048, 1052, 31 L.Ed.2d 394 (1972). Discussing the transfer of a convicted felon from prison to a psychiatric treatment facility, the Supreme Court stated that "[t]he loss of liberty produced by an involuntary commitment is more than a loss of freedom from confinement." *Vitek v. Jones,* 445 U.S. 480, 492, 100 S.Ct. 1254, 1263, 63 L.Ed.2d 552 (1980).

> None of our decisions holds that conviction for a crime entitles a State not only to confine the convicted person but also to determine that he has a mental illness and to subject him involuntarily to institutional care in a mental hospital.

*Id.* at 493, 100 S.Ct. at 1264.

J.A.J. was indeterminately committed to a psychiatric treatment facility. The record includes only a sparse report on the characteristics of care, treatment, or discipline at Mille Lacs Academy Residential Treatment Center. The probation officer's report notes

that the facility offers "sex specific counselling and a psychiatric component," with psychiatric evaluation and monitoring and thorough counselling. The probation officer did not address the restrictiveness of the facility, although he stated it offered a less confrontative form of therapy than another program. Weeks after the confinement order, the facility sought and obtained unrestricted authority to administer psychotropic medications to J.A.J.

There is no cause to dwell on the euphemism of "residential treatment center" to contrast this program with any other inpatient mental health facility. Nor is there reason to believe the intrusiveness of the program is diminished by its "academy" label. In fact, if judicial authority is to be employed to impose involuntary and indeterminate confinement on an individual, assumptions about the severity of the confinement should favor the individual, not the public authority that proposes the confinement and fails to furnish the court with a full description of the facility.

Moreover, the record includes one piece of additional information that compels an expectation that the confinement of J.A.J., like any to a psychiatric treatment facility, involves a massive loss of liberty. Weeks after J.A.J.'s confinement and after the commencement of this appeal, according to documents in the record, the program staff requested and the probation officer obtained for them from the juvenile court an order authorizing staff to select and administer psychotropic medications to J.A.J. "as directed" from time to time by the staff physician and corrections agents. The center's initial prescription, noted in its request for court authorization, anticipates having J.A.J. ingest a substantial daily dosage of the anti-depressant drug Zoloft.

Because of the grave infringement on liberty when the State seeks to commit an individual to a psychiatric facility, the State must meet a high evidentiary standard to justify such a commitment, showing "by clear and convincing evidence that the individual is mentally ill and dangerous." *Foucha v. Louisiana,* 504 U.S. 71, 80, 112 S.Ct. 1780, 1786, 118 L.Ed.2d 437 (1992) (quoting *Jones v. United States,* 463 U.S. 354, 362, 103 S.Ct. 3043, 3048, 77 L.Ed.2d 694 (1983)).

The record contains inadequate evidence to show that J.A.J. was either mentally ill or dangerous in August 1995. The medical or social reports on J.A.J.'s mental and emotional condition reveal some angry reactions of a young child faced with an array of anxiety-producing circumstances, such as the death of a sibling, possible abuse, and bitter feuding between divorced parents.[7] The reports

---

7. One commentator's comments are instructive on the subject of expert reports cumulating in recommendations for confinement of juveniles for psychiatric treatment:

There exist no criteria, commonly accepted or applied within the fields of child and adolescent psychiatry and psychology, to guide decisions about juvenile mental hospital admissions. * * * In the absence of professional guidance in the form of standards, certain rather vague and overly broad criteria have been promulgated. These criteria may falsely convey a level of precision in admission decisions that does not exist. The National Association of Private Psychiatric Hospitals ("NAPPH"), an organization whose members may have a financial interest in high admission rates, publishes criteria that could be used to justify the hospitalization of most troublesome, and many not-so-troublesome, juveniles. Not only do these criteria cite "sexual promiscuity" as an example of "self-defeating" and/or "self-destructive" behavior necessitating "immediate acute-care hospitalization [as] the only reasonable intervention," but they fail to define what type of sexual activity constitutes "prom-

iscuity." Such a standard allows anyone using the guidelines to apply personal moral standards in making admission decisions. No link between the sexual activity and a basic mental disturbance must be demonstrated prior to admission; the link apparently is presumed.

Lois A. Weithorn, *Mental Hospitalization of Troublesome Youth: An Analysis of Skyrocketing Admission Rates,* 40 Stan.L.Rev. 773, 785–86 (1988); *see also Parham v. J.R.,* 442 U.S. 584, 628–29, 99 S.Ct. 2493, 2517–18, 61 L.Ed.2d 101 (1979) (Brennan, J., dissenting):

[T]he chances of an erroneous commitment decision are particularly great where children are involved. Even under the best of circumstances psychiatric diagnosis and therapy decisions are fraught with uncertainties. These uncertainties are aggravated when * * * the psychiatrist interviews the child during a period of abnormal stress in connection with the commitment * * *. These uncertainties may be further aggravated when economic and social class separate doctor and child, thereby frustrating the accurate diagnosis of pathology. These compounded uncertainties often lead to erroneous commitments since psychiatrists

do not show by "clear and convincing evidence" any mental or emotional abnormality on the part of J.A.J.

One of two basic reports on the mental health of J.A.J. is premised on contact with him early in 1993, well before both his delinquent act in October of that year and an outpatient therapy experience that occurred due to the ultimate recommendation in that report. The other is merely conclusory and was authored by a staff person whose qualifications cannot be discerned from the record. The latter report includes no assertion that J.A.J. suffers from a dangerous or disabling mental illness.

Observations in the April 1993 report included substantial evidence of J.A.J.'s threatening ideas and conduct toward his mother and himself, but all at unstated times and much of it evidently in J.A.J.'s preteen years. J.A.J. expressed wishes to die to the 1993 evaluator but currently denies having such thoughts. According to the record, J.A.J. has conducted himself appropriately for more than a year and a half since the indecent exposure incident. This evidentiary showing is not sufficient to meet the high standard of proof needed to justify the confinement on an individual at a psychiatric facility for mental health treatment.

The due process protections triggered by the proposal for involuntary mental health confinement apply to children as well as adults. *Parham v. J.R.*, 442 U.S. 584, 600, 99 S.Ct. 2493, 2503, 61 L.Ed.2d 101 (1979) ("It is not disputed that a child, in common with adults, has a substantial liberty interest in not being confined unnecessarily for medical treatment * * *.") Justice Brennan's dissent in *Parham*, challenging the court's ultimate application of due process law, is illuminating. Asserting that the chances of an erroneous institutional commitment are particularly great where children are involved, he states:

> Indeed, it may well be argued that children are entitled to more protection than are adults. The consequences of an erroneous commitment decision are more tragic where children are involved. Children, on the average, are confined for longer periods than are adults. Moreover, childhood is a particularly vulnerable time of life and children erroneously institutionalized during their formative years may bear the scars for the rest of their lives. * * * * [And d]ecisions of the lower courts have chronicled the inadequacies of existing mental health facilities for children.

*Id.* at 627–628, 99 S.Ct. at 2517 (citations omitted). *See also*, Weithorn, *supra*, at 796–98 (describing the risks of psychiatric hospitalization for children).

Having established that an involuntary confinement to a psychiatric institution of an individual who has not been shown to have a psychological condition is an unconstitutional restriction of the committed individual's liberty, and that children are not exempt from this protection, the only remaining constitutional inquiry is whether due process applies in juvenile proceedings as well as adult cases. The Supreme Court, in a line of cases including *Kent, Gault, In re Winship,* and *Breed v. Jones,* has applied, and expanded, due pro-

tend to err on the side of medical caution and therefore hospitalize patients for whom other dispositions would be more beneficial.

[Note: The above passages are included in an attempt to indicate the dangers associated with the recommendation for inpatient psychiatric care of young people. They are not included to suggest that specific observations made in them necessarily apply to the juvenile system's disposition of J.A.J.'s case. Then again, the dangers they recite would seem to be compounded when (a) the root concern in the case traces to a sex offense where there is not any record of other sexual activity, let alone a record of sexual promiscuity or repeated misconduct, and (b) the recommended disposition is not shown to be supported by any current psychiatric opinion.] Weithorn continues:

The symptoms associated with "adjustment disorders" also do not suggest the presence of a serious mental disorder. Adjustment disorders, also called "transitional disorders" or "situational disorders," are characterized by an "overreaction" of some sort to identifiable social stressors (such as parental fighting), leading to impairment in social or occupational functioning. Incorporated into the formal definition of these disorders, however, is a recognition that "the disturbance will eventually remit after the stressor ceases or, if the stressor persists, when a new level of adaptation is achieved."

Weithorn, *supra*, at 791 (citing *American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders* 299–301, 329–31 (3d ed. 1980)).

cess and other criminal procedure protections to juvenile proceedings. *Kent v. United States,* 383 U.S. 541, 86 S.Ct. 1045, 16 L.Ed.2d 84 (1966) (juvenile courts must provide alleged delinquents with hearings and counsel before transferring juvenile to adult court); *In re Gault,* 387 U.S. 1, 87 S.Ct. 1428, 18 L.Ed.2d 527 (1967) (states must provide juveniles with notice of charges, must inform them of right to counsel, must permit them the privilege against self-incrimination, and must allow cross-examination of witnesses); *In re Winship,* 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970) (juvenile courts must apply reasonable doubt standard in cases where alleged offense is a criminal act); *Breed v. Jones,* 421 U.S. 519, 95 S.Ct. 1779, 44 L.Ed.2d 346 (1975) (double jeopardy prohibits trying a juvenile in both juvenile and adult court for same offense).

Moreover, the Court has not restricted its comments to procedural due process in juvenile proceedings. In *Gault,* Justice Fortas announced cause for reform of both the procedural and the substantive standards in juvenile proceedings:

Juvenile Court history has again demonstrated that unbridled discretion, however benevolently motivated, is frequently a poor substitute for principle and procedure. * * * * The absence of substantive standards has not necessarily meant that children receive careful, compassionate, individualized treatment.

*Gault,* 387 U.S. at 18, 87 S.Ct. at 1438–39.

Recently, the Supreme Court again articulated the extension of due process considerations beyond procedure. The Court stated in the 1992 commitment case *Foucha v. Louisiana* that "the Due Process Clause contains a substantive component that bars certain arbitrary, wrongful government actions 'regardless of the fairness of the procedures used to implement them.'" *Foucha,* 504 U.S. at 80, 112 S.Ct. at 1785 (quoting *Zinermon v. Burch,* 494 U.S. 113, 125, 110 S.Ct. 975, 983, 108 L.Ed.2d 100 (1990)). Despite J.A.J.'s representation by competent counsel and a series of hearings and procedures in this matter, the juvenile system still acted on him in such a way as to " 'minimize the importance and fundamental nature' of [J.A.J.'s] right to liberty." *Id.* (quoting *United States v. Salerno,* 481 U.S. 739, 750, 107 S.Ct. 2095, 2103, 95 L.Ed.2d 697 (1987)).

This case, illustrating the failure of thorough procedure to secure a just result, presents compelling justification for reform of the substantive workings of juvenile courts in the same vein as hallmark cases *Kent* and *Gault* reformed the procedural juvenile processes. The juvenile system as founded celebrated being (a) beneficial and (b) informal. Informality yielded to stricter procedural requirements. This case should signal the arrival of a time for scrutinizing what the juvenile justice system finds "beneficial" to the juvenile. As J.A.J.'s counsel protests, it seems an outrageous result that the State may inflict harsher penalty on a child in the service of his "best interests" than it is permitted to inflict upon an adult for the purpose of retribution for crime.

Finally, judicial action in the matter of the welfare of J.A.J. is squarely in conflict with a constitutional guarantee other than substantive due process. The juvenile court's medication order was a violation of J.A.J.'s privacy rights under the Minnesota constitution.

The Minnesota Supreme Court has recognized psychiatric medication as "intrusive" treatment that "seriously infringe[s] upon a[n individual's] right of privacy." *Jarvis v. Levine,* 418 N.W.2d 139, 144 (Minn.1988) (citing *Price v. Sheppard,* 307 Minn. 250, 239 N.W.2d 905 (1976)). Before ordering medication, a trial court must make findings on numerous factors, including:

(1) the extent and duration of changes in behavior patterns and mental activity effected by the treatment, (2) the risks of adverse side effects, (3) the experimental nature of the treatment, (4) [the treatment's] acceptance by the medical community of this state, (5) the extent of intrusion into the patient's body and the pain connected with the treatment, and (6) the patient's ability to competently determine for himself whether the treatment is desirable.

*Price,* 307 Minn. at 262–63, 239 N.W.2d at 913; *Jarvis,* 418 N.W.2d at 147 (upholding *Price* as standard governing medication or-

ders under the Minnesota constitution). There is no logic in treating *Jarvis* as the bedrock principle of law for commitment cases but inapplicable to inpatient psychiatric care compelled by a juvenile court.

J.A.J.'s treatment was ordered ex parte, and nothing in the record indicates that the court considered any of the *Price* factors, a final example of indifference toward established constitutional protections, presumably for the erroneous reason that its actions were directed toward a child rather than an adult.

### IV.

In addition to the constitutional deficiencies in the trial court proceedings, there were several other substantive and procedural problems with J.A.J.'s disposition.

Dispositional standards in human welfare cases—in juvenile, domestic, and hospitalization cases—are often very general, creating immense discretion for judges and others. The most illustrative of these general standards is the notion of doing what is "best." But there have been a number of achievements in developing more useable standards, and that is especially true for juvenile court dispositions.

Seven meaningful points of law were implicated in the trial court decisions now before us:

a. For a lawful disposition, there must be a record that the choice of action is necessary, not merely that it is best.

b. The law prefers, when determining what is best, to leave children in their own home.

c. When a child is placed out of the home, the record must show a correlation between the child's needs and the residential services proscribed.

d. Treatment recommendations must be premised on a fact-based assessment, not on assumptions.

e. When choosing an out-of-home placement, the prospective duration of care must be determined.

f. Rigid statutory proscriptions govern the choice to place a child in secure detention.

g. Findings of fact must be sufficiently particularized to fairly disclose the reasons for a juvenile court disposition.

The disposition in the matter of the welfare of J.A.J. transgressed each of these matters of law on juvenile court dispositions.

#### 1. Necessity.

In August 1995, the juvenile court found that because of J.A.J.'s "personality and psychological disorders," J.A.J.'s needs could not be met in outpatient treatment. This is why, the court said, it was "in the best interest of the child" to commit him indeterminately to a residential treatment program—one that was said to furnish psychiatric services with "sex specific" counselling. Two months later, ex parte, the juvenile court ordered administration of medications to J.A.J. as directed by a staff physicians and corrections staff.

The juvenile code calls for the choice of a disposition that is "deemed necessary to the rehabilitation of the child." Minn.Stat. § 260.185, subd. 1 (1994). We have described this need as one "to restore law-abiding conduct in the juvenile." *In re Welfare of M.R.S.*, 400 N.W.2d 147, 151 (Minn. App.1987).

The legislature has limited the juvenile court's dispositional powers to those necessary to return the juvenile to lawful behavior; thus, "[i]t is reversible error, both arbitrary and unjust, to impose a disposition without evidence that [the disposition] is 'necessary' for the declared statutory purpose of restoring law-abiding conduct." *In re Welfare of L.K.W.*, 372 N.W.2d 392, 398 (Minn.App. 1985). "The promise of benefits in a disposition, that the choice would be good or even best, does not permit an action which is not necessary." *Id.* at 399 (citation omitted). Under governing provisions of the Minnesota juvenile code, the most substantial error in the J.A.J. disposition is the disregard of this statutory mandate by the prosecutor, the probation officer, and the juvenile court.

We have previously identified the two dimensions of the necessity standard: (a) the severity of the child's delinquency, which takes into account the range of public safety

concerns; and (b) the severity of the disposition. *Id.* at 398. Further,

> [w]hen the severity of intervention is disproportionate to the severity of the problem, the intervention is not necessary and cannot lawfully occur. The court must take the least drastic necessary step.

*Id.* In this case, the juvenile court insistently disregarded arguments of J.A.J.'s counsel that there was simply no public safety concern prompting an involuntary confinement disposition in August 1995, after the child had been placed under probationary supervision in February 1995 and had successfully complied with conditions of supervision.

The prosecutor urged the juvenile court to act on purported treatment needs of the child, stating that the purpose of the juvenile court is not to determine a disposition appropriate for the offense. The probation officer testified that he does not concern himself with the seriousness of the juvenile's offense, but looks instead at the child's needs. Hearing arguments of the child's attorney regarding the choice of a disposition appropriate for the offense, the juvenile court refused to look at the offense. These arguments of defense counsel, the court insisted, were going "in one ear and out the other."

On this record, there is no indication of need in August 1995 for a further disposition, much less a removal from the child's home. J.A.J.'s disposition could not have been recommended, argued, or ordered without insistently disregarding that the statutes limit dispositions to what is necessary to restore the law-abiding conduct of the child. As the following make unusually clear, public safety considerations were wholly absent when the court ordered the involuntary confinement:

a. The delinquency at issue in the case was a misdemeanor offense by a 14–year–old child.

b. The delinquency occurred nearly 22 months before the confinement was ordered.

c. J.A.J. had previously been on probation from February to August, 1995, because of the 1993 misdemeanor and had met all conditions of supervision, including the 7 p.m. curfew time imposed by his probation officer.

d. During the nearly two-year period since his misdemeanor offense, the record shows no misbehavior of J.A.J. and reports that he maintained a "good record" in school and successfully performed in a part-time job.

e. All of J.A.J.'s adolescent offenses occurred in his mother's home, in an environment that included his reported role as the victim of abuse. In his father's custody, J.A.J. has posed no further threats to public safety.

When examining the question of necessity, we must also keep in mind the severity of the juvenile court's disposition. Here, involuntary, indeterminate confinement to a residential treatment facility was ordered in a case whose file came to Anoka County with a warning label attached, stating that agreement on a misdemeanor finding in Hennepin County had occurred in contemplation that there would not be an out-of-home placement.

The appellate courts will affirm a juvenile court disposition, whether or not it coincides with their judgment, if it is not an arbitrary exercise of the juvenile court's broad discretion. *L.K.W.*, 372 N.W.2d at 397. Because the record contains neither juvenile court findings nor evidence that a further disposition, least of all indeterminate confinement for mental health treatment, was necessary to restore J.A.J. to law-abiding conduct, the juvenile court abused its discretion in its residential confinement of J.A.J. based on his purported "disorders." The juvenile court explained "why" it concluded the best interests of the child required removal, as required by Minn.Stat. § 260.185, but its explanation is unacceptable as a matter of law.

2. Best interests; removal.

Ignoring the question of necessity for a further disposition, the juvenile court proceeded on a finding as to J.A.J.'s best interests.

The juvenile code invites attention to the child's best interests in a delinquency disposition. The code requires that the juvenile court's dispositional findings show "why the best interests of the child are served by the

disposition ordered." Minn.Stat. § 260.185, subd. 1. But we have previously concluded, precisely because of the statutory reference to the child's best interests, that a residential treatment placement is appropriate only when the needs of the child cannot be met at home. *L.K.W.*, 372 N.W.2d at 399–400.

The county attorney argues on appeal that there is no preference in Minnesota for allowing adjudicated delinquents to remain at home. This claim is without merit and is an inappropriate defense of the J.A.J. disposition.

The legal preference against out-of-home placements is an historic cornerstone of the juvenile court. The earliest federal agency standards on the work of the juvenile courts stated as a "fundamental principle" that "there should be a presumption in favor of keeping the child in his own home and his own community, except when adequate investigation shows this not to be in the best interest of the child." Juvenile–Court Standards, Children's Bureau Publication No. 121 (1923).

Modern amendments to the Minnesota juvenile code purpose section have preserved a prior statement of this preference only in a clause related to cases of children in need of protection. Minn.Stat. § 260.011, subd. 2(a) (1994). For the following reasons, however, this reshaping of the statement of purpose does not diminish the importance of a public policy preference against removal of children from their homes:

a. The purpose clause on delinquency cases continues to insist that public safety concerns be pursued through fair and just means that respect the needs and opportunities of children. Minn.Stat. § 260.011, subd. 2(c) (1994).

b. The statutory requirement of findings on a child's best interests puts a burden on the juvenile court in delinquency cases to explain why a placement is made and why the child is not kept in the home. Minn.Stat. § 260.185, subd. 1.

c. The preference for a home placement is compelled in part by the statutory standard permitting only what disposition is "necessary," which, in turn, protects the present circumstances of a child who poses no threat to public safety.

d. The preference for non-removal coincides precisely with the related family law concept that child custody will ordinarily not be changed absent a showing of danger in the child's current placement. Minn.Stat. § 518.18(d)(iii) (1994).

e. The preference for non-removal, a public policy view that "the best interests of the child are normally served by parental custody," is a settled, historic principal in the traditions of Minnesota law, not rooted alone in declarations of aims by the legislature. *In re Welfare of A.R.W. and Y.W.C.*, 268 N.W.2d 414, 417 (Minn.1978), *cert. denied*, 439 U.S. 989, 99 S.Ct. 588, 58 L.Ed.2d 663 (1978) (employing the quoted language).

f. Finally, we cannot interpret statutes to produce absurd results. Minn.Stat. § 645.17(1) (1994). To examine changes in the form of a code purpose section and to find in them an abolition of the substantive preference for non-removal, attributes folly to a legislative enactment. It charges the legislative body with adoption of the public policy notion that Minnesota's juvenile courts can be indifferent to leaving children in their own homes. And it attributes to the legislature the will to invite our juvenile courts to be without concern for the minimum constitutional guarantees of substantive due process of law. *See* Minn.Stat. § 645.17(3) (stating presumption that legislature does not intend to violate constitution).

The preference for non-removal may give way in appropriate cases to public safety concerns. *See* Minn.Stat. § 260.125, subd. 2b (1994) (enumerating, for certification decisions, the factors that suggest public safety concerns); *In re Welfare of D.S.F.*, 416 N.W.2d 772, 774 (Minn.App.1987) (affirming set-term corrections placement following adjudication of third degree assault) *review denied* (Minn. Feb. 17, 1988). But public safety, if generally of some weight, has no effect at all on the juvenile court's August 1995 disposition in this case. The juvenile court's action, although in a delinquency case, was not based on the delinquency of J.A.J. or on any evidence of public safety hazards. Rath-

er, the court acted on purported treatment needs of the child, for the child's best interests. In the circumstances of this case, a respect for the child's home placement is a showing of due regard for the stated legislative aim in child protection cases, which continues to state the historic preference for non-removal. Minn.Stat. § 260.011, subd. 2(a).

The preference for non-removal of J.A.J. is not diminished by any evidence that the child's presence in his father's home in August 1995 posed a danger to himself or to the public. The juvenile court's conclusion on the child's best interests is inappropriate as a matter of law. For similar reasons, if we were to view the juvenile court's recitation of J.A.J.'s best interests as a finding of fact, it was clearly erroneous. *L.K.W.*, 372 N.W.2d at 397 (applying clear error standard to review fact findings underlying a juvenile court's dispositional choice).

3. Best interests; J.A.J.'s needs ("disorders").

The best interests standard requires that a placement be suitable to the child's needs. *Id.* at 399–400. The standard consequently prompts an examination both of the child's needs and the services offered by a proposed residential program. This opinion has already addressed evidence pertaining to the services offered by the Mille Lacs Academy Residential Treatment Program and now reviews the juvenile court's findings that J.A.J. was committed because of his "personality and psychological disorders."

Evidence of J.A.J.'s "personality" disorders are indicated in the record, if at all, by (a) conclusory observations of "behavioral problems", (b) reported manifestations of J.A.J.'s anger, especially toward his mother, each instance of which preceded April 1993, many times by years, (c) reports of anger and fighting over three years ago, in the course of family conflict, reportedly in a dysfunctional family setting, and (d) medical terminology in an early 1993 psychological report about probable and borderline personality traits manifested mostly in expressions of anger. The record shows no bad behavior of J.A.J. since October 1993.

Other evidence of dysfunction, described earlier, relates to the juvenile court's finding of "psychological disorders." The report with the greatest medical significance was two-and-a-half years old in August 1995, and it ended with a recommendation for outpatient treatment service. More current reports were conclusory and failed to show a disabling mental illness. The primary current report was authored by a staff person whose credentials are not disclosed.

Overall, on the record before us, the finding of J.A.J.'s personality and psychological disorders in August 1995 is clearly erroneous. And given the evidence that explains the finding, it is an inadequate statement of cause for the conclusion that it is in the child's best interests to be committed indeterminately for psychiatric treatment. The error in this best interests conclusion is compounded by the subsequent step of the juvenile court, without reliable evidence and with no findings of fact, delegating to unstated staff persons the absolute authority to prescribe and administer psychotropic or other medications in their custodial care of J.A.J.

4. Best interests; sex offender treatment.

If a child has committed an enumerated offense, including an act of indecent exposure, the juvenile court shall obtain an assessment of "the child's need for sex offender treatment" and shall order that the child undergo treatment when the assessment says it is needed. Minn.Stat. § 260.185, subd. 1(h) (1994). The assessor "must be experienced in the evaluation and treatment of juvenile sex offenders." *Id.*

Presumably, the PHASE assessment was completed pursuant to the sex offender evaluation provision of section 260.185. The evaluation was ordered in February 1995 without explanation. A PHASE staff person recommended that J.A.J. be placed in a residential treatment center "with a sex-specific component" so that J.A.J. could deal with "sexual issues" and emotional problems. Nothing in the record indicates the professional qualifications of the PHASE staff person who prepared this report.

The PHASE report dealing with "sexual issues" states views of J.A.J. about sex-related topics and reviews his attitude toward his 1993 delinquency. The report contains no statement that J.A.J. needs sex offender treatment, either inpatient or outpatient. While J.A.J.'s October 1993 delinquency is properly considered a sex offense, the record contains no professional opinion that J.A.J. has the treatment needs of a sex offender, and the juvenile court made no such finding. Therefore, the court's apparent conclusion that it was in J.A.J.'s best interests to receive sex offender treatment is unsupported by the record.

### 5. Best interests; indeterminate placement.

The custody of J.A.J. was transferred for placement "until [the] placement is terminated," with the first review to occur at the end of one year. The indeterminate disposition does not comply with the statute declaring a time specification mandate. *See* Minn.Stat. § 260.185, subd. 4 (1994) (orders transferring legal custody of a child "shall be for a specified length of time set by the court."). Equally significant is the fact that the record is totally silent on the proposed length of treatment at Mille Lacs Academy Residential Treatment Center.

For any patient in an intrusive mental health program, it is critically important to anticipate whether the treatment is apt to last for 30 days or 30 months. A juvenile court assessment of a child's needs, which is part of its best interests findings on the suitability of a proposed placement, cannot occur without professional reporting on the predicted duration of inpatient services thought to be needed. To explore this proposition of law, it is helpful to consider Minn. Stat. § 253B.09, subd. 5 (1994), providing that an initial civil commitment is for a term not to exceed six months and providing for a much earlier written report to the court on the question of need for completing the initially stated period of inpatient treatment. And Minnesota's commitment code is designed to promote the ends of substantive as well as procedural due process. Section 253B.09, subdivision 5, represents a substantive protection with constitutional ramifications.

### 6. Secure detention.

The loss of J.A.J.'s liberties began more ignominiously than in the confinement for treatment. On July 14, 1995, precipitated by nothing J.A.J. was doing, but solely as part of the ongoing deliberation of public officials on a treatment disposition, J.A.J. was summarily removed from his home and placed in secure detention, where he evidently remained until taken to the psychiatric treatment facility some weeks after the juvenile court's dispositional order on August 11. The secure detention was unexplained in court orders but recommended in a probation report that recited the opposition of J.A.J.'s father to a further treatment disposition and the speculation of J.A.J.'s mother that the father's opposition might lead to his effort to abscond with the boy.

The repugnance of J.A.J.'s secure detention might be lamented mostly because it appears to be the fruit of opposition to a course of dispositional action that was relentlessly aimed in a direction that flatly contradicted minimum liberty interests of the child under the federal and state constitutions. It was evidently the ironic price for legitimately insisting on freedom.

The legislature has carefully limited the involuntary detention of children. It has even more rigidly restricted the secure detention of children, evidently appreciating the complete loss of liberty involved in an incarceration that, notwithstanding the euphemism of detention, is indistinguishable from simple jailing.

There was neither statutory authority nor subject matter jurisdiction for the juvenile court to order any taking of a child's custody, even without secure detention, in the absence of a sworn affidavit that "there are reasonable grounds to believe the child is in surroundings or conditions which endanger the child's health, safety or welfare and require that the child's custody be immediately assumed by the court." Minn.Stat. § 260.135, subd. 5 (1994); *see* Minn.Stat. § 260.165, subd. 1(a) (1994). Continued detention requires a juvenile court finding of probable

cause of a similar kind. Minn.R.Juv.P. 18.06, subd. 5(b). A detention order is valid for eight working days, so that detention of J.A.J. on July 14, 1995, required renewed court orders on July 25, August 3, and at like subsequent intervals of time. Minn.Stat. § 260.172, subd. 2 (1994).

When detained by a lawful court order, the juvenile can be kept in secure detention for only 24 hours unless further secure detention is enabled under Minn.Stat. § 260.173. Minn. Stat. § 260.173, subd. 1 (1994). There is no stated power, even for a court, for further secure detention. A juvenile court has no subject matter jurisdiction to exceed the limits of the statute, unless the detention is premised on an allegation that the child is being detained for adjudication on an accusation that the child has committed a delinquent act or violated conditions of probationary supervision. Minn.Stat. § 260.173, subd. 4.

In sum, the secure detention of J.A.J. in 1995 was wholly unlawful, substantively and procedurally. Here too, the error has a vital constitutional dimension. The United States Supreme Court has permitted preventative detention where a juvenile is accused of a crime and detention is defensible for the public's "legitimate interest in protecting a juvenile from the consequences of his criminal activity" and where anticipated court proceedings are expedited. *Schall v. Martin*, 467 U.S. 253, 266, 270, 104 S.Ct. 2403, 2410–11, 2413, 81 L.Ed.2d 207 (1984).

7. Findings of fact.

To explain his incarceration and confinement, now in its ninth month, J.A.J. has been given a skimpy pronouncement of inexact words as findings of fact, that the confinement meets his "needs" and that it will address his "personality and psychological disorders." These findings offend the meaning and spirit of the statutory mandate for findings, Minn.Stats. § 260.185, subd. 1a, and offend the promise of "fundamental fairness" that is at the root of the constitutional guarantee of procedural due process. *See Kent*, 383 U.S. at 554, 86 S.Ct. at 1053–54 ("[T]here is no place in our system of law for reaching a result of such tremendous consequences

[waiver of jurisdiction] without ceremony— without * * * a statement of reasons."); *McKeiver v. Pennsylvania*, 403 U.S. 528, 543, 91 S.Ct. 1976, 1985, 29 L.Ed.2d 647 (1971) (observing fundamental fairness as the cardinal principle of procedural due process for the juvenile court).

V.

Ultimately, the breaches of constitutional and statutory law that beset J.A.J. conflict severely with the simplest standards of the juvenile justice system: In its effort to protect the public, the court is to employ means that are both "fair and just." Minn.Stat. § 260.011, subd. 2(c). If the system functions as it did with J.A.J., it becomes a substantial threat to public safety, not its shield.

The loss of liberty by J.A.J. is unique in the annals of appellate law. Research produces no indication than any appellate court has previously been asked to examine a disposition with such widespread implications in terms of statutory law on juvenile court dispositions and constitutional rights for substantive due process. Is this a sign that cases like this are uncommon or even rare? We are unable to answer that question absent an effective practice of monitoring placements of children.

The most effective form of monitoring juvenile court dispositions is likely through the scrutiny of a lawyer for the child who is experienced in juvenile justice and appellate jurisprudence and who is obligated to consider a child's appellate remedies. It is significant that this case was appealed in October 1995, about 18 months after an amendment changing Minnesota law to permit the services of the state public defender for appeals in juvenile delinquency cases. *See* Minn. Laws 1994, c. 556, § 52; Minn.Stat. § 611.25, subd. 1(3) (1994). This appeal was initiated by an assistant state public defender and is evidently one of the first juvenile court dispositional appeals handled by that office. The surfacing of this case for appellate scrutiny, in this substantive and procedural condition, is testimony to the remarkable juvenile court reform that may be achieved in Minnesota by the simple choice to guarantee qualified and

committed counsel to effect the right of appeal.

I observed in the introduction to this concurrence that the severity of the assault of J.A.J.'s liberty interests demonstrates a new arena of concern for either controlling juvenile court excesses or abandoning the ongoing "experiment" of the juvenile court. *McKeiver*, 403 U.S. at 547, 91 S.Ct. at 1987 (declaring tolerance for informal process with the explanation that the court could be viewed as a public policy experiment that could be assessed better if not prematurely restricted). The experience of J.A.J. will support various conclusions.

At a minimum, *In re Welfare of J.A.J.* begs for enlarged scrutiny of the substantive work of the juvenile court. More meaningful standard-setting may be necessary for any "best interests" placement of children, so that the juvenile code on placements resembles the careful prescriptions of the commitment code, chapter 253B of our statutes. More specifically, there appears to be a critical need to formulate meaningful time limits for dispositions.

Once again, Minnesota's provision of appellate legal services for children responds well to the need for scrutiny of the juvenile justice system. For a system teetering on the brink of acceptability as an institution in our public life, this level of service may give it more legitimacy. All participants in the juvenile court process are now on notice of the right of review that can be protected by a state public defender who has uncompromised loyalty to the liberty interests of the child. Perhaps we can anticipate, at least in Minnesota, a resurrection of cognizance and respect for substantive due process in the juvenile court.